**LEAGUE OF UNITED LATIN AMERICAN CITIZENS and Lawrence Felix, Individually, and on behalf of all others similarly situated, Plaintiffs,**

v.

**The CITY OF SANTA ANA, a Municipal Corporation, et al., Defendants.**

No. CV 74–767–F.

United States District Court, C. D. California.

March 12, 1976.

As Amended March 22, 1976.

878

A. Thomas Hunt, Timothy B. Flynn, Carlyle W. Hall, Jr., John R. Phillips, Brent N. Rushforth, Fredric P. Sutherland, Center for Law in the Public Interest, Los Angeles, Cal., Paul Bryan Gray, South El Monte, Cal., for plaintiffs.

James A. Withers, City Atty., Robert C. Sangster, Richard E. Lay, Deputy City Attys., Santa Ana, Cal., Edward D. Kalman, Boston, Mass., for defendants.

## MEMORANDUM OPINION

FERGUSON, District Judge.

Mexican-American individuals comprise 25.8% of the general population of the City of Santa Ana but only 9.2% of the police officers employed by the Santa Ana Police Department and only 4.5% of the firefighters employed by the Santa Ana Fire Department. In an effort to rectify this disparity, plaintiffs Lawrence Felix and the League of United Latin American Citizens ("LULAC") have filed a class action civil rights suit alleging discrimination by the City of Santa Ana and several named city officials in the process by which police officers and firefighters are selected for employment. Specifically the plaintiffs allege discrimination in the recruitment practices, the use of the California Short-Form Test of Mental Maturity, 1963 revision ("Short Form"), the use of the Fire Aptitude Test, Form 45 ("Form 45"), the imposition of a fixed height requirement, and the employment of a high school education or equivalency requirement.

The defendants concede the disparity between Mexican-Americans' representation in the general population and their representation in the police and fire departments, but deny that Santa Ana's general population statistics are an appropriate yardstick for comparison. Instead they offer Orange County labor force statistics as the relevant standard. Moreover, they believe that the hiring procedures they have relied upon, although occasionally flawed, have developed to the point that they might serve as a model for other jurisdictions.

Indeed, Santa Ana has exercised creative leadership in the development of personnel techniques which other jurisdictions would do well to emulate. Moreover, the defendants have exhibited an exemplary commitment to the development of personnel policies which might assure equal opportunity and quality police and fire protection. Nonetheless, although Santa Ana has proceeded in all good faith, the plaintiffs have presented convincing evidence that the recruitment policies and some of Santa Ana's hiring policies improperly operate to exclude Mexican-Americans from positions with the police and fire departments. The plaintiffs have demonstrated that these policies have developed because of a misconception of the requirements of Title VII and the civil rights statutes and a misapplication of the EEOC Guidelines.

As is so often the case in employment discrimination litigation, an orderly examination of the principal issues requires presentation of a complicated factual picture. Many of the facts relevant to the disposition of this lawsuit were stipulated to by the parties; others were developed in the course of a seven day trial.

I. *Factual Background.*

1. This action was filed in March of 1974 pursuant to Title VII of the Civil Rights Act of 1964 as amended in 1972 (42 U.S.C. § 2000e, *et seq.*) and pursuant to the general civil rights statutes, 42 U.S.C. §§ 1981, 1983.

2. Plaintiff Lawrence Felix is a Mexican-American citizen who applied for employment as a uniformed patrolman with the City of Santa Ana in the years 1969, 1972, and 1973. He participated in oral interviews and took written and physical examinations, but was denied employment in each of the years he applied.

3. On December 20, 1974 plaintiff Felix was certified by the court as the representative of a class composed of: "(a) all Mexican-Americans who have applied for employment as police officers or firefighters with the defendant City of Santa Ana within three years of the commencement of this action; (b) all Mexican-Americans who presently are applicants for such employment; and (c) all Mexican-Americans who may apply for

such employment in the future, who apply during the effective term of any final decree this Court may issue . . . ."

4. Plaintiff League of United Latin American Citizens ("LULAC") is a membership organization active in the pursuit of the civil rights of its membership and of Mexican-Americans in general. It is suing on behalf of one or more of its Mexican-American members who are past applicants for employment with either the police or fire departments in Santa Ana.

5. Defendant City of Santa Ana is a chartered municipal corporation located in Orange County and incorporated pursuant to the laws and Constitution of the State of California. The city performs many functions including the prevention, suppression, and extinguishment of fires within the city limits and the prevention of crime and maintenance of public order within the city limits. The former functions, of course, are performed by the Santa Ana Fire Department; the latter by the Santa Ana Police Department.

6. Defendant Vernon Evans is the Mayor of Santa Ana. Defendant Bruce C. Spragg is the City Manager. Defendant Donald Bott is the Personnel Director. Defendant Raymond C. Davis is the Police Chief. Defendant Eugene Judd is the Fire Chief.

7. The principal offices of defendant City of Santa Ana are located within the Central District of California. All individual defendants reside within the Central District, and the employment practices questioned in this litigation were implemented in the Central District.

8. Federal jurisdiction and venue with respect to the Title VII component of this action are based upon § 706(f)(3) of that title, 42 U.S.C. § 2000e–5(f)(3). Jurisdiction and venue for the 42 U.S.C. §§ 1981, 1983 aspects of this litigation rest upon 28 U.S.C. §§ 1343(3) and (4) together with 28 U.S.C. §§ 1391(b) and (c).

9. As of May 31, 1975, Mexican-Americans constituted 9.2% of the uniformed work force of the Santa Ana Police Department and 4.5% of the Santa Ana Fire Department. The specific numbers are as follows:

(a) Police Department
| | |
|---|---|
| Total | 249 |
| Mexican-American | 23 |

(b) Fire Department
| | |
|---|---|
| Total | 221 |
| Mexican-American | 10 |

10. According to the 1970 census, the population and labor force statistics for Santa Ana and for Orange County are as follows:

(a) General population, Santa Ana
| | |
|---|---|
| Total | 146,247 |
| Mexican-American | 37,732 (25.8%) |

(b) General population, Orange County
| | |
|---|---|
| Total | 1,420,386 |
| Mexican-American | 160,168 (11.3%) |

(c) Civilian labor force, Santa Ana
| | |
|---|---|
| Total | 61,736 |
| Mexican-American | 13,289 (21.5%) |

(d) Civilian labor force, Orange County
| | |
|---|---|
| Total | 575,570 |
| Mexican-American | 56,936 (9.9%) |

11. Mexican-American applicants have been recruited in numbers far below what might be expected for a city with a Mexican-American population exceeding 25% of the total. No statistics were available showing the ethnic breakdown of applications received for uniformed positions in the police and fire departments for the years prior to and including 1971. The parties stipulated, however, that the percentage of Mexican-Americans appearing for the written tests in the years 1972–74 approximated the percentage of Mexican-American applicants.

| | 1972 | 1973 | 1974 |
|---|---|---|---|
| (a) Fire Department | | | |
| Total recruits | 220 | 117 | 571 |
| Mexican-Americans | 34(15.5%) | 10(8.5%) | 99(17.3%) |
| (b) Police Department | | | |
| Total recruits | 144 | 162 | 810 |
| Mexican-Americans | 8(5.5%) | 14(8.6%) | 128(15.8%) |

Given recruitment statistics such as these, it is hardly surprising that the percentage of Mexican-Americans em-

ployed in the police and fire departments falls far below the percentage of Mexican-Americans in the city's general population. Contrast, for example, the fact that 24.7% of the craftsmen and 27.6% of the laborers employed by the City of Santa Ana as of June 1, 1973 were Mexican-Americans. At the outset, it is curious that the city could attract so many Mexican-Americans for lesser paying jobs and so few for higher paying jobs.

Defendants insist that this disparity is explained by the "fact" that the "natural" labor market for fire and police positions is Orange County, not Santa Ana, and that the percentages of Mexican-American applicants support that analysis. Moreover, the defendants assert that at least since the middle of 1973, they have organized a laudable recruitment program specifically designed to reach groups protected under Title VII.

Specifically, the defendants point to the employment of Mr. Joseph Canton in July, 1973 as a personnel analyst who has been designated specific job functions in the city's "outreach" recruitment program. Although Mr. Canton's recruitment efforts in periods when no vacancies were available in the police and fire departments were relatively minor, when vacancies did become available, Mr. Canton launched a full-time recruitment effort, and he was assisted by four or five minority persons in the police or fire departments and by the staff of the Personnel Department. These efforts ranged from personal contacts, newspaper, radio, and television advertisements, and the dissemination of brochures. Moreover, Mr. Canton made special efforts to involve organizations prominent for their representation of minority groups, such as the plaintiff LULAC. The defendants argue, therefore, that the failure to attract Mexican-American applicants proportionate to that group's representation in the city population is traceable to economic factors beyond their control, i.e., a labor market broader than the confines of the city.

This court nonetheless finds that the low percentage of Mexican-American ap-plicants is traceable to other factors. First and foremost is the fact that the defendants *concentrated* their recruitment efforts outside the City of Santa Ana. Each of the witnesses who spoke to this issue testified that the majority of the defendants' recruitment efforts were directed outside the city. For example, Captain Stebbins testified that the recruiting efforts for the police department were concentrated in the southern California area, most particularly in Los Angeles County, Orange County, and Riverside County. The evidence indicates that the persuasive impact of the recruitment efforts of the city have been felt in the Orange County area outside the city.

It is not surprising, therefore, that in 1974, 84.1% of the applicants for positions with the police department and 71.6% of the applicants for positions with the fire department resided outside the City of Santa Ana. Thus the percentage of Mexican-American applicants is closer to the county-wide statistics than to the city statistics. This court finds that the primary cause for this phenomenon has been the nature of the recruitment. Other factors which have served to deter Mexican-American applications have been the imposition of height and high school degree requirements (discussed *infra*) and a poor reputation in the Mexican-American community.

Indeed Mr. Canton admitted that his contacts with the Mexican-American community and with its leadership revealed such substantial suspicion of the city's attitude toward Mexican-Americans that the idea of forming a minority advisory group to assist the city in minority recruitment for the fire department was rejected. Mr. Canton testified that his contacts with individuals in the community revealed a suspicion about the depth of the city's commitment to minority hiring and a belief that the city had a "poor track record" in this area. A recruitment program concentrated in Santa Ana could have effectively served to combat this reputation. Defendants' efforts to recruit Mexican-American ap-

plicants for police and fire positions can only be justified in terms of Orange County population statistics. As is discussed in section III, *infra,* that position cannot be reconciled with the philosophy and objectives of the Civil Rights Acts.

12. In 1973, and the years prior thereto, all applicants for police officer positions in Santa Ana were required to be at least 5′ 8″ in height. The requirement was eliminated in 1974. A 5′ 7″ height requirement was imposed prior to 1973 for the firefighter position, but was eliminated in 1973. The defendants conceded that they were unaware of any validation studies which demonstrate that a height requirement is job-related or is a valid predictor of job performance. The parties stipulated that a 5′ 7″ height requirement disqualified approximately 13.8% of the white male population and approximately 42.9% of the Mexican-American male population. A 5′ 8″ requirement disqualified approximately 23.7% of the white male population and approximately 56.8% of the Mexican-American male population.

■ In an astonishing bit of testimony, an employee of the City of Santa Ana advanced the defendants' position that the height requirements (which *automatically* operate to exclude between 42.9% and 56.8% of the Mexican-American male population) have not been a barrier to the recruitment of Mexican-Americans. This remarkable conclusion was said to be supported by the fact that the witness' "personal review of our employment files [disclosed] that no Mexican-American applicant has ever been denied or rejected for employment in the police and fire department during the last three years in question here because of . . . a failure to meet a height requirement." But all the employment file search demonstrates is that when a city circulates job descriptions which state minimum height requirements (as the city did here), those who do not meet those requirements will not apply. The failure of "short" Mexican-Americans to apply for these positions indicates that they *read* job bulletins, not that they are uninterested. This court finds that the height requirement constituted a substantial barrier to the recruitment of Mexican-American applicants for positions with the Santa Ana police and fire departments.

Mr. Charles Guenther, a personnel analyst for the City of Santa Ana, conceded that the height requirement is an inaccurate measure of the physical skills necessary for the positions in question. The court has no way of determining how many qualified applicants were deterred from applying, but considering the arbitrary character of the requirement and the substantial segment of the population it operated to exclude, this court is forced to conclude that significant numbers of qualified Mexican-Americans were deterred from applying.

13. All applicants for police officer and firefighter positions in Santa Ana have been and are required to possess a high school degree or "G.E.D." equivalency diploma. Indeed, California Government Code § 1031(e) requires that police officers be high school graduates or pass the "G.E.D." equivalency exam. The parties stipulated that "in Orange County, according to the 1970 census, 37.8% of the Mexican-American males aged twenty through twenty-four do not have a high school degree or equivalency; for white males of the same ages in Orange County, the high school degree or equivalency requirement eliminates 14.6%." The defendants stipulated in the pretrial order that they were unaware of any validation studies which demonstrate that the high school degree is a "job-related, valid predictor of job performance" for the position of firefighter. No such "studies" were presented at trial with respect to the police officer positions.

On the other hand, there was evidence presented to support the proposition that the reading level required to comprehend the firefighter training manuals was at the 11–12th grade level. Moreover, defendants' expert, Dr. Wollock, after conducting an extensive job analysis including 164 interviews with police officers in 30 jurisdictions, concluded that the high school diploma requirement or equivalen-

cy standard is "a very reasonable standard for a police officer." This conclusion coincided with that of the Task Force Report of the President's Commission on Law Enforcement and the Administration of Justice which recommended as "[a]n appropriate first step" that "all departments . . . immediately establish a requirement that no person be employed in a sworn capacity until he has received a high school diploma and has demonstrated by appropriate achievement tests the ability to perform successfully college level studies." Moreover the Commission itself observed that:

> A policeman today is poorly equipped for his job if he does not understand the legal issues involved in his everyday work, the nature of the social problems he constantly encounters, the psychology of those people whose attitudes toward the law differ from his. Such understanding is not easy to acquire without the kind of general knowledge that higher education imparts . . . . Police candidates must be sought in the colleges, and especially among liberal arts and social science students.

Despite this impressive authority, the plaintiffs submitted evidence which casts considerable suspicion on the utility of a high school education requirement. Most significant was the testimony of Mr. Guenther who offered the disturbing and uncontradicted conclusion that "until very recently, at least, the Santa Ana Unified School District would grant a high school diploma to anyone who achieved a reading skill level of the fifth grade level."

This testimony, however, does not address the question of the capabilities of the typical high school graduate in Santa Ana or the overall quality of the educational experience for the typical graduate. Although Mr. Guenther's testimony on this point is disquieting in the extreme, it is not a sufficient reed upon

which to decide that the high school experience in Santa Ana is so radically dissimilar from that of other jurisdictions as to render the Presidential Commission's conclusions inapplicable.

Nor is there evidence that the continuation of a high school requirement would discriminate against Mexican-Americans. The evidence produced at trial disclosed that approximately 40% of the high school student population in Santa Ana are Mexican-Americans. This figure which exceeds the Mexican-American percentage of the total population by some 15% suggests that a relatively large proportion of Mexican-Americans are about to receive a high school diploma. This court finds, therefore, that the continuation of the high school degree requirement would not have an adverse impact on Mexican-Americans. The extent to which the imposition of the high school requirement was justified in past years is discussed in section V.

14. In general, the overall acceptance rates do not reveal a pattern of discrimination against those Mexican-Americans who have *applied* for these public safety positions. The comparative acceptance rates for the firefighter position in the years 1972–1974 are as follows:

| | Mexican-Americans | White and all others | Whites |
|---|---|---|---|
| **1972** | | | |
| Applied | 34 | 186 | 160 |
| Hired | 2 | 17 | 13 |
| Acceptance rates | 5.9% | 9.1% | 8.1% |
| **1973** | | | |
| Applied | 10 | 107 | 86 |
| Hired | 3 | 13 | 13 |
| Accepted rates | 30.0% | 12.1% | 15.1% |
| **1974** | | | |
| Applied | 99 | 472 | 392 |
| Hired | 2 | 15 | 10 |
| Acceptance rates | 2.0%[1] | 3.2% | 2.6% |
| **1972–74 combined** | | | |
| Applied | 143 | 765 | 638 |
| Hired | 7 | 45 | 36 |
| Acceptance rates | 4.9% | 5.9% | 5.6% |

In the absence of these apparently unavoidable disqualifications, the Mexican-American acceptance rate would have been 4%.

---

1. Two additional Mexican-Americans successfully passed the selection procedures but were ultimately disqualified for bona fide medical reasons which the plaintiffs do not question.

Mexican-American applicants constituted 15.7% of the applicant population and 13.5% of the total appointments.

15. The comparative acceptance rates for the position of police officer in the years 1972–74 are as follows:

| | Mexican-Americans | White and all others | Whites |
|---|---|---|---|
| 1972 | | | |
| Applied | 8 | 136 | 130 |
| Hired | 1 | 13 | 12 |
| Acceptance rates | 12.5% | 9.6% | 9.2% |
| 1973 | | | |
| Applied | 14 | 148 | 143 |
| Hired | 1 | 12 | 12 |
| Acceptance rates | 7.1% | 8.1% | 8.4% |
| 1974 | | | |
| Applied | 128 | 682 | 611 |
| Hired | 9 | 38 | 34 |
| Acceptance rates | 7.8% | 5.6% | 5.6% |
| 1972–74 combined | | | |
| Applied | 150 | 966 | 884 |
| Hired | 11 | 63 | 58 |
| Acceptance rates | 7.3% | 6.5% | 6.6% |

Mexican-American applicants constituted 13.4% of the total applicant population, and Mexican-Americans accounted for 14.9% of the appointments.

16. The hiring procedure which leads to the appointment of Santa Ana uniformed police officers and firefighters is administered by the city's personnel department. Applications are normally processed once per year for the police department and once every two years for the fire department.

The filing period for the positions in question lasts from three to six weeks. After it closes, applications are screened to eliminate those who fail to meet basic standards including education and age standards.

Those who survive the initial screening proceed through an examination process which includes written tests, oral interviews, and physical agility tests. An "eligible" list is prepared, and the candidates are listed in rank order.

As vacancies occur, appointments are made from the eligible lists in order of rank subject to a "rule of three." That rule requires that at any time when one or more appointments are made from the eligible list, only two persons may be bypassed on the list for the purpose of making appointments not in rank order.

17. In 1971 and the years prior thereto, the California Short-Form Test of Mental Maturity, 1963 Revision ("Short Form" test) was administered to applicants for positions in both police and fire departments. Statistics comparing the performance of white and Mexican-American applicants on the Short Form test for this period are unavailable.

18. After 1971, applicants for uniformed positions in the relevant departments were administered the following written tests:

(a) Fire Department
　　1972 Short Form Test
　　　　　SRA Pictorial Reasoning Test
　　1973 Fire Aptitude Test, Form 45
　　1974 Fire Aptitude Test, Form 45
　　　　　SRA Pictorial Reasoning Test
(b) Police Department
　　1972 Short Form Test
　　1973 Short Form Test
　　1974 Law Enforcement Aptitude, Form 51X

19. The comparative performance of Mexican-American and white applicants on written tests administered for the firefighter positions in the years 1972 and following is as follows:

| | Took Written Test | Passed Written Test | Percentage Passing |
|---|---|---|---|
| 1972 | | | |
| Whites | 160 | 86 | 53.7% |
| Mexican-Americans | 34 | 12 | 35.3% |
| 1973 | | | |
| Whites | 86 | 50 | 58.1% |
| Mexican-Americans | 10 | 3 | 30.0% |
| 1974 | | | |
| Whites | 378 | 378 | 100% |
| Mexican-Americans | 96 | 95 | 99% |

In 1973, the passing score on the Form 45 test was 48. In 1974, the passing score on the Form 45 test was reduced to 19. If the same method of scoring employed in 1973 had been followed in 1974, the percentages of persons passing would have been reduced in the case of white

applicants to 55.7% of the white applicants and to 21.2% in the case of Mexican-American applicants.

The mean average scores by race on each written test administered to firefighter applicants since 1971 are as follows:

| | White Mean | Mexican-American Mean |
|---|---|---|
| 1972 | | |
| Short Form Test | 76.10 | 66.15 |
| SRA Pictorial | 58.98 | 57.18 |
| 1973 | | |
| Form 45 | 49.90 | 38.64 |
| 1974 | | |
| Form 45 | 49.08 | 38.93 |
| SRA Pictorial | 58.91 | 55.04 |

20. The comparative performance of Mexican-American and white applicants on written tests administered for police officer positions in the years 1972 and following is as follows:

| | Took Written Test | Passed Written Test | Percentage Passing |
|---|---|---|---|
| 1972 | | | |
| Whites | 130 | 82 | 63.1% |
| Mexican-Americans | 8 | 5 | 62.5% |
| 1973 | | | |
| Whites | 143 | 78 | 54.5% |
| Mexican-Americans | 14 | 2 | 14.3% |

In 1974, 128 Mexican-Americans and 611 whites took the written tests. All persons were passed.

The mean average scores by race on the written tests administered to police officer applicants in 1974 was as follows:

| | White Mean | Mexican-American Mean |
|---|---|---|
| 1973 | | |
| Short Form | 74.64 | 69.00 |
| 1974 | | |
| Law Enforcement Aptitude | 40.51 | 35.64 |

21. Defendants could not produce any studies bearing on the question of whether or not the Short Form test (used prior to 1973 in the fire department and prior to 1974 in the police department) is a job-related, valid predictor of job performance for the positions in question.

22. The defendants maintain that the Form 45 test has been validated by a study conducted under the auspices of the Selection Consulting Center. The study entitled "Validation of Entry-Level Firefighter Examinations in the State of California and Nevada" was conducted by virtue of a $120,000 grant from the United States Civil Service Commission. It took sixteen months to complete, required more than four work years of time, and involved seventy-three jurisdictions throughout California and Nevada.

The study used a sample of incumbent firefighters from seventy-three jurisdictions. Each of the participants, whose experience on the job ranged from one to six years, took the Form 45 examination. Each of the participants also was ranked by supervisors in terms of nine criteria which a job analysis revealed to be important performance dimensions of firefighter performance in each of the participating jurisdictions. The basic inquiry of the study, then, was to determine whether there was a statistically significant relationship between the incumbents' performance on the test and their ranking in job performance.

The validity coefficients generated separately for whites and Mexican-Americans revealed statistically significant correlations for each of the groups on all nine criteria. Practical significance was also established by considering the selection ratio, the success rates on the job, the size of the validity coefficients (which ranged from .389 to .568 for Mexican-Americans), and the economic and human risks involved in hiring unqualified individuals for the job. The study concluded that the test was practically useful in the selection of firefighters and that the same test scores have equivalent prediction of job success for each racial group.

The plaintiffs essentially do not contest the fairness with which the study was conducted, the quality of the job analysis, or the strength of the correla-

tion coefficients.[2] The plaintiffs do contest the adequacy of the sample and the adequacy of the procedure to protect against the effects of supervisorial bias. The substance of those objections and additional facts relevant thereto will be considered in section VI.

## II. *Standing.*

The defendants assert that "One of the most startling features of this case is the utter absence of a case or controversy. No named plaintiff or class representative was personally aggrieved by any of the challenged practices."

■ Standing to sue, of course, is a basic Constitutional requirement under Article III. In the absence of standing, there is no case or controversy, and thus a basic threshold inquiry is to determine "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' to warrant *his* invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975) (emphasis in original), *quoting Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962).

■ There is no question but that the plaintiffs have standing to sue.

Plaintiff Felix has applied three times for a position with the Santa Ana Police Department; three times he has been rejected. The second amended complaint alleges that he "was rejected for service as a uniformed police officer by defendants due to defendants' illegal and discriminatory practices." Specifically Felix contends that although he "passed" the written tests (which he alleges to be discriminatory), his score on them was low causing him to be eliminated from consideration at later stages in the hiring process.[3] He claims to be entitled to backpay and to a priority hiring order. As the plaintiffs remark, "It is difficult . . . to imagine an individual plaintiff with a more direct personal stake in the outcome of the controversy." [4]

■ Plaintiff LULAC also has a right to bring this lawsuit. It alleged in the second amended complaint that it has "one or more members who have been direct victims of defendants' illegal and discriminatory hiring practices in that those members have been refused employment by defendants by reason of defendants' illegal and discriminatory employment practices." Plaintiff Felix is one member of LULAC who allegedly has been the victim of the defendants' practices. LULAC's position in this case is quite unlike that of the Sierra Club in

---

**2.** The plaintiffs do point to the fact that there is a difference in group means on test performance but no significant difference in group means on job performance. This phenomenon, they suggest, raises serious questions as to the fairness of the same passing test scores for Mexican-Americans since their test scores were lower. The defendants countered this by citing ¶ 9 of the American Psychological Association, "Standards For Educational and Psychological Tests" which states that, "A simple difference in group means does *not* by itself identify an unfair test . . . ." (emphasis in original). Instead the Standards recommend comparisons between correlation coefficients, regression equations, and means and variances for each variable. The defendants' evidence established that these procedures indicated that the differences in group means did not invalidate the test.

**3.** Thus *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, 44 U.S.L.W. 4095 (1976) is inapplicable. Here plaintiff's claim rests on

an immediate injury not on future speculation. Nor does *Rizzo* bear on the plaintiff's standing to raise the rights of others, since the exception applicable here (discussed *infra*), was not involved there. Compare note 14.

**4.** It is possible that plaintiff Felix may not prevail when in later proceedings the specifics of his claim are explored, but the question of standing does not turn on whether the plaintiff ultimately prevails. *See, e. g., Huff v. N. D. Cass Co.,* 485 F.2d 710 (5th Cir. 1973) (en banc). It is clear at this juncture that Felix' claim is substantial and does not amount to a sham. The court has already determined that the Short Form test administered to plaintiff Felix is an illegal and discriminatory practice. See section VII. The question of whether specific individuals are entitled to backpay and the specific amounts involved will be determined in later proceedings. See section VIII. The parties had agreed in the pretrial order that the amount of backpay would not be litigated in this initial trial.

*Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and its position is quite different from its own situation in *League of United Latin American Citizens v. Hampton*, 163 U.S. App.D.C. 283, 501 F.2d 843 (1974). In those cases the organizational plaintiffs failed to allege that any of their members were among the injured, and the courts, therefore, held that they were merely interested bystanders without a direct stake in the controversy. In cases where organizational plaintiffs have alleged specific injury, standing has been permitted. Here LULAC has alleged a specific injury, and its position is, therefore, more akin to that of SCRAP in *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) and that of the Bridgeport Guardians, Inc. in *Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Service Commission*, 354 F.Supp. 778 (D.Conn.), *rev'd in part on different grounds*, 482 F.2d 1333 (2nd Cir. 1973), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975). *See also Arkansas Education Association v. Board of Education*, 446 F.2d 763 (8th Cir. 1971).

 The suggestion of the defendants that there is no case or controversy in this matter, therefore, borders on the frivolous. Of greater substance (albeit still unsatisfactory) is the defendants' contention that the plaintiffs should be confined to litigating the specific practices which have plagued them and that they should not be permitted to litigate or represent the class on any practices which did not specifically affect them. This argument misconceives the broad approach to standing which the courts have taken in racial discrimination cases. The philosophy perhaps was best explained in *Huff v. N. D. Cass Co.*, 485 F.2d 710, 713–14 (5th Cir. 1973) (en banc):

At the appellate level we have made clear that we give full scope to Title VII, recognizing, as we do, that employment discrimination is "one of the most deplorable forms of discrimination known to our society, for it deals not just with an individual's sharing in the 'outer benefits' of being an American citizen, but rather the ability to provide decently for one's family in a job or profession for which he qualifies and chooses," and recognizing also that racial discrimination, which is by definition class discrimination, is a particularly virulent form of employment discrimination, because it is generally both subtle and pervasive. *We have applied a broad approach to standing, stressing the individual's role as private attorney general taking on the mantle of the sovereign.* (emphasis added).

Thus the Supreme Court has endorsed the view that Title VII exhibits " 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution.'" *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 367, 34 L.Ed.2d 415, 419 (1972), *quoting Hackett v. McGuire Brothers, Inc.*, 445 F.2d 442, 446 (3d Cir. 1971).[5] And the Ninth Circuit has recognized that an exception to the general rule that persons may not raise the rights of others is that "Congress may grant standing by statute to persons who might otherwise lack standing." *Construction Industry Association v. City of Petaluma*, 522 F.2d 897, 904 (1975).

 In keeping with these broad concepts, the courts have permitted "across the board" system-wide attacks on racial discrimination. *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122 (5th Cir. 1969). Illustrative is the approach taken in *Long v. Sapp*, 502 F.2d 34, 43 (5th Cir. 1974):

---

5. The Court left open the question of whether the same concepts apply to 42 U.S.C. § 1982. 409 U.S. at 209 n. 8, 93 S.Ct. at 366, 34 L.Ed.2d at 419. The only area in which reliance on the Civil Rights Act of 1866 is apparently necessary here is that of the Short Form test, and there an expansive concept of standing is unnecessary inasmuch as plaintiff Felix maintains that that device specifically injured him. See section VII.

Like the plaintiff in *Georgia Highway Express*, Mrs. Long directs her claims at racially discriminatory policies that she alleges pervade all aspects of the employment practices of Jackson County. Having shown herself to be a black and a former employee, albeit lawfully discharged, she occupies the position of one she says is suffering from the alleged discrimination. She has demonstrated the necessary nexus with the proposed class for membership therein. As a person aggrieved, she can represent other victims of the same policies, *whether or not all have experienced discrimination in the same way* (emphasis added), *citing Reed v. Arlington Hotel Co., Inc.*, 476 F.2d 721 (8th Cir. 1973), *cert. denied*, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1974).[6]

Thus, once a claim of injury has been properly made, the courts have been willing to permit plaintiffs to serve as the class representatives for occupations for which they have not applied (*Crockett v. Green*, 388 F.Supp. 912 (E.D.Wis. 1975) (plaintiff who applied for job as bricklayer and mason permitted to litigate discrimination involving mechanics and repairmen, electricians, heavy equipment operators, stationary engineers, skilled machinery occupations, carpenters, compositors, typesetters and "kindred" workers)); for people of races other than their own (*National Organization for Women v. Bank of California*, 5 EPD ¶ 8510 (N.D.Cal.1973) (black plaintiff permitted to represent class of black persons and Spanish-surnamed individuals discriminated against because of race or ethnic background)); for practices which were not and on the facts could not have been adversely applied to them (*Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (5th Cir. 1970) (plaintiff who applied for position with telephone company permitted to litigate (1) the company's high school diploma requirement despite the fact that he had graduated from high school and (2) the company's recruitment program despite the fact that that program had not prevented him from applying)).[7] *See generally Scott v. University of Delaware*, 68 F.R.D. 606, 607 (D.Del.1975).[8]

■ The basic principle underlying these cases is that if it is constitutional for the Congress to permit publicly employed representatives to bring lawsuits on behalf of the public, it is constitutional to permit individuals who have suffered injury to bring lawsuits on behalf of the public. *Cf. Sierra Club v. Morton*, 405 U.S. 727, 737, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636, 644 (1972).

■ Thus on the basis of the private attorney general theory and the fact that racial discrimination is by definition class discrimination, plaintiff Felix has standing to represent the class on practices which did not apply to him (*e. g.*, the high school education requirement, the height requirement, the Form 45 test), and he also has standing to represent the class with respect to public safety occupations for which he had not ap-

---

6. Defendants' position that the doctrine is confined to cases of intentional discrimination is inconsistent with the private attorney general rationale, with the intent of Congress, and with the fact that the statute addresses itself to the consequences of the practices, not their intent. The defendants' theory is not borne out by the cases. *See, e. g., Rowe v. General Motors Corporation*, 457 F.2d 348 (5th Cir. 1972); *Crockett v. Green*, 388 F.Supp. 912 (E.D.Wis.1975); *Davis v. County of Los Angeles*, 8 FEP Cases 239 (C.D.Cal.1973). *But see Cooper v. Allen*, 467 F.2d 836 (5th Cir. 1972).

7. Neither *Vulcan Society v. Civil Service Commission*, 490 F.2d 387 (2d Cir. 1973) nor *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972) holds differently. *Vulcan* merely leaves the question open; *Castro* decides that one who does not meet a height requirement has standing; it does not hold that those who did meet the height requirement could not have standing.

8. "In Title VII cases, the courts have consistently held that one who has been a victim of a discriminatory employment practice . . . may bring a class action on behalf of others who have allegedly been victims of the same *or other* types of discriminatory employment practices at that institution." (emphasis added).

plied, *i. e.*, the fire department.[9] Both departments are run by the same employer with common personnel procedures and policies. An "across the board" attack is warranted under the circumstances.[10]

In addition to the foregoing, LULAC contends that it has standing because if it prevails "fire and police services in the Santa Ana Mexican-American Communities will be improved." [11] The principal case in support of this position is *Trafficante v. Metropolitan Life Insurance Co., supra.* There white tenants sued under Title VIII of the Civil Rights Act (which prohibits discrimination in housing) claiming that discrimination against nonwhites by the owners of the apartment complex in which they resided had deprived them of the social benefits of living in an integrated community, had deprived them of business opportunities and professional advantages which would have accrued if they had lived with members of minority groups, and had caused them embarrassment and economic damage by virtue of being "stigmatized" as residents of a "white ghetto." The Court held that even though the plaintiffs were not the objects of the discrimination, they were nevertheless "aggrieved" persons within the meaning of Title VIII. 42 U.S.C. § 3610(a).

The question posed by LULAC's position is whether or not a similar interpretation should apply to the term "aggrieved" persons within the meaning of Title VII. 42 U.S.C. § 2000e–5. It is instruc-tive to note at the outset that the Court in *Trafficante* relied on court interpretations of the "aggrieved" term in Title VII to assist it in determining the meaning of the same term in Title VIII.[12] 409 U.S. at 209, 93 S.Ct. at 366, 34 L.Ed.2d at 419. Nothing in *Trafficante* suggests that the term in Title VII should receive a narrow interpretation.

Yet one court has held that a different construction of Title VII is appropriate:

> Title VIII was intended to ensure all persons a living environment free from unlawful discrimination. This Court is not persuaded, however, that Congress sought through Title VII to protect whatever interest white persons might have in working in an environment which is free from discrimination against racial and ethnic minorities. Unlike Title VIII, which was intended to change living environments for all by changing housing patterns through ending housing discrimination, Title VII is aimed at lifting economically persons belonging to racial and ethnic minorities by providing equal access to employment opportunities. *Waters v. Heublein, Inc.,* 8 EPD ¶ 9522, at 5308 (N.D.Cal.1974).

The court, without direct reference to the legislative history, concluded that "Persons who are not the objects of racial or ethnic discrimination in employment are not within the zone of interests Congress intended to protect with Title VII." *Id.*

---

9. Indeed, in response to a motion for summary judgment, plaintiff Felix, through an affidavit of his attorney, in part rebutted a claim that he had not been injured by the defendants' practices by stating that he had been "directly affected by the alleged illegal recruitment practices in that despite the fact that he was known by defendants to be interested in a public safety job in Santa Ana, he never was recruited for the Fire Department."

10. If Felix were not permitted to litigate the height and high school education requirements, no one could. The defendants managed to deter all prospective applicants not meeting those requirements. *See Jackson v. Sergeant,* 394 F.Supp. 162 (D.Mass.1975).

11. It also contends that its members will be employed. To that extent, its standing argument is stronger than that of Felix because while Felix may not be subject to employment discrimination arising from a height or high school education requirement, other members of LULAC could be.

12. "[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners & Dyers v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204, 1207 (1932). To the extent that aggrieved persons includes individuals who are not the objects of the discrimination in Title VIII, a similar conclusion would normally obtain in other sections of the Act.

Nonetheless there is persuasive evidence in the legislative history that, as was the case in Title VIII, the supporters of Title VII were concerned with factors that went beyond the interests of those who were the immediate objects of discrimination. Particularly persuasive is the joint statement of Representatives McCulloch, Lindsay, Cahill, Shriver, MacGregor, Mathias, and Bromwell. Their statement was designed to accompany House Report No. 714 (on H.R. 7152 which became the Civil Rights Act of 1964) because the abbreviated House Report presented a need for "fuller documentation of the reasons for the bill. The urgency of the measure makes it imperative that its supporters state why it is so important." The statement makes clear that the interests of the bill's supporters were not confined to a concern for the objects of the discrimination. In particular the statement observed that employment discrimination denies

> to the Nation the full benefit of the skills, intelligence, cultural endeavor, and general excellence which the Negro will contribute if afforded the rights of first-class citizenship.

> The failure of our society to extend job opportunities to the Negro is an economic waste. . . .

> . . . . .

> The employment needs in practically every professional and technical field are expected to rise substantially . . . . Likewise, the requirements for managers, clerical workers, sales workers, craftsmen, foremen, and similar skilled occupational groups are all projected for large increases. To deny to the Nation the means to fill these needs and, thereby, to maintain its

economic superiority is to deny the Nation the ability to continue as the leading country in the world. 1964 *United States Code Congressional and Administrative News* 2514–17.

This is not to imply that considerations of upgrading the level of the work force were paramount in the legislators' minds. The joint statement points out that "Aside from the political and economic considerations, however, we believe in the creation of job equality because it is the right thing to do." *Id.* at 2517. It is to say that when LULAC states that one of its interests in bringing the lawsuit is that if it prevails public safety services in Santa Ana will be improved, it calls into play considerations which clearly were within the "zone of interests" contemplated by the Civil Rights Act of 1964.[13]

Nor is it decisive in the posture of this case that the plaintiff's affidavit is *phrased* in the language of advantage rather than in the language of injury. The statement of advantage necessarily implies that LULAC has been unfairly denied a benefit (*cf.* Zarefsky, "The 'Traditional Case'—'Comparative Advantage Case' Dichotomy: Another Look," 6 *Journal of the American Forensics Association* 12, 14 (1969)), and as the Supreme Court stated in *SCRAP,* " 'The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.' " 412 U.S. at 689 n. 14, 93 S.Ct. at 2417, 37 L.Ed.2d at 271, *quoting* Davis, "Standing: Taxpayers and Others," 35 *U.Chi.L.Rev.* 601, 613 (1968). But it is not even necessary to determine if the principles of *SCRAP* stretch to

---

13. The importance of these considerations was reaffirmed by the report of the House Education and Labor Committee which, in the process of supporting the 1972 amendments, stated, "The problem of employment discrimination is particularly acute and has the most deleterious effect in these governmental activities which are most visible to the minority communities (notably education, law enforce- ment, and the administration of justice) with the result that the credibility of the government's claim to represent all the people equally is negated." 1972 *U.S.Code Congressional and Administrative News* 2153. Clearly the committee was concerned with the quality of law enforcement in minority communities. Its interests coincide with those of LULAC.

meet this situation. Here LULAC has already alleged a definite injury to one or more of its members. The situation is therefore analogous to the law explained in *Sierra Club v. Morton, supra,* 405 U.S. at 737–38, 92 S.Ct. at 1367, 31 L.Ed.2d at 644:

> [O]nce review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate. It was in the latter sense that the "standing" of the appellant in *Scripps-Howard* existed only as a "representative of the public interest." It is in a similar sense that we have used the phrase "private attorney general" to describe the function performed by persons upon whom Congress has conferred the right to seek judicial review of agency action.

Here too, LULAC, having properly invoked the judicial process in pursuit of a hiring order, may point to violations of the statute in view of its standing as a representative of the "zone of interests" contemplated by the legislation.[14] Of course, this is a broad view of standing, but as previously mentioned, Congress' intent in this area was that standing be defined "as broadly as is permitted under Article III of the Constitution."

### III. *Prima Facie Case.*

The Civil Rights Acts do not require employers to hire minority groups in proportion to their representation in the population. Indeed, Title VII specifically provides that:

> Nothing contained in this subchapter shall be interpreted to require any employer . . . to grant preferential treatment to any individual or to any group because of the race . . . of such individual or group on account of an imbalance which may exist with respect to the total number or percent-

age of persons of any race . . . employed by any employer . . . in comparison with the total number or percentage of persons of such race . . . in any community, State, section, or other area, or in the available work force in any community, State, section, or other area. 42 U.S.C. § 2000e–2(j).

Nonetheless such population statistics can be of procedural import in employment discrimination cases. A plaintiff can establish a prima facie case of discrimination solely through the use of comparative statistics.

As the Eighth Circuit recently explained in *Green v. Missouri Pacific Railroad Co.,* 523 F.2d 1290, 1293–94 (1975):

> A disproportionate racial impact [sufficient to establish a prima facie case] may be established statistically in any of three ways. The first procedure considers whether blacks as a class (or at least blacks in a specified geographical area) are excluded by the employment practice in question at a substantially higher rate than whites. *See Griggs v. Duke Power Co.,* supra, 401 U.S. [424] at 430 n. 6, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (on the requirement of a high school diploma, the Court cited statistics from the U.S. Census Bureau that in North Carolina only 12 percent of black males had completed high school while 34 percent of white males had done so); *United States v. Georgia Power Co.,* 474 F.2d 906, 918 (5th Cir. 1973) (the court cited statistics from the South and from the Atlanta area showing that a substantially higher percentage of whites had completed high school than blacks); *Gregory v. Litton Systems, Inc.,* 316 F.Supp. 401, 403 (C.D.Cal.1970), *aff'd,* 472 F.2d 631 (9th Cir. 1972) (the court cited national arrest statistics showing that blacks suffered a disproportion-

---

14. *Warth v. Seldin, supra,* does not contradict this view. To the contrary, the case specifically states, "Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute." 422 U.S. at 514, 95 S.Ct. at 2213, 45 L.Ed.2d at 363. *Warth* distinguished *Trafficante* precisely because in *Warth* no statutory right was present.

ately high percentage of arrests); *Johnson v. Pike Corp.*, 332 F.Supp. 490, 494 (C.D.Cal.1971) (the court cited general studies indicating that blacks' wages were garnished at a disproportionately high rate).

The second procedure focuses on a comparison of the percentage of black and white job applicants actually excluded by the employment practice or test of the particular company or governmental agency in question. *See Griggs v. Duke Power Co., supra,* 401 U.S. at 430 n. 6, 91 S.Ct. 849, 28 L.Ed.2d 158; *Vulcan Society of the New York City Fire Dept. v. Civil Service Comm. of the City of New York,* 490 F.2d 387, 392 (2d Cir. 1973); *Bridgeport Guard, Inc. v. Members of the Bridgeport Civil Service Comm.,* 482 F.2d 1333, 1335 (2d Cir. 1973); *cf. Rogers v. International Paper Co.,* supra, 510 F.2d [1340] at 1348–49 (8th Cir. 1975).

Finally, a third procedure examines the level of employment of blacks by the company or governmental agency in comparison to the percentage of blacks in the relevant geographical area. *See Bridgeport Guard, Inc. v. Members of the Bridgeport Civil Service Comm., supra,* 482 F.2d at 1335–36; *United States v. Georgia Power Co., supra,* 474 F.2d at 910; *Butts v. Nichols,* 381 F.Supp. 573, 579 (S.D.Ia.1974) (three-judge court); *cf. Rodriguez v. East Texas Motor Freight,* supra, 505 F.2d [40] at 54–55 (5th Cir. 1974).[15]

 The rationale of the statistical prima facie case is obvious. If an employer utilizes hiring procedures which fail to employ minorities in percentages substantially departing from their representation in the population, there are grounds for concern that the racially disproportionate impact of those procedures have been the product of discriminating devices. If an employer can demonstrate that minority individuals are uninterested in, or unqualified for, the employment in question, no Title VII violation would lie. Title VII, however, assumes that protected groups are both qualified for and interested in employment; thus, the failure to hire such groups in percentages related to their representation in the population justifies shifting the burden to the party most familiar with the nature of the job, the qualifications needed for the job, and the relationship of the hiring procedures to those qualifications.

Of course, there are areas of alleged discrimination in which it would be unreasonable to draw even a threshold inference of discrimination. The defendants seize on such cases, for example, *Mayor of Philadelphia v. Educational Quality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1973), in an effort to demonstrate that threshold inferences can never be drawn from population data.

In *Mayor of Philadelphia,* the plaintiffs attempted to show discrimination in the selection of the thirteen members of a body called the Educational Nominating Panel. The function of the panel was to seek out candidates for the Philadelphia Board of Education and to recommend nominees to the Mayor of Philadelphia. Under the terms of the city charter, only four of the panel members were to be drawn from the population at large. The remaining members of the panel were required to be selected from the highest ranking officers of nine different categories of city-wide organizations, one from each category. Clearly, resort to general population statistics in

---

**15.** As to the third procedure, discussed in *Green, see also Carter v. Gallagher,* 452 F.2d 315, 323 (8th Cir.), *adopted in relevant part as opinion of court en banc,* 452 F.2d 327, 331 (1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *Jones v. Lee Way Motor Freight, Inc.,* 431 F.2d 245, 247 (10th Cir. 1970), *cert. denied,* 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971); Comment, "Business Necessity Under Title VII of the Civil Rights Act of 1964: A No-Alternative Approach," 84 *Yale L.J.* 98, 107 (1974); Note, "Employment Testing: The Aftermath of *Griggs v. Duke Power Company,*" 72 *Colum.L. Rev.* 900, 909–12 (1972).

the *Mayor of Philadelphia* case was inappropriate. As the Court pointed out:

> [T]his is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded. At least with regard to nine seats on the Panel and assuming, *arguendo,* that percentage comparisons are meaningful in a case involving discretionary appointments, the relevant universe for comparison purposes consists of the highest ranking officers of the categories of organizations and institutions specified in the city charter, not the population at large. . . . Furthermore, the District Court's concern for the smallness of the sample presented by the 13-member Panel was also well founded. *Id.* at 620–21, 94 S.Ct. at 1333, 39 L.Ed.2d at 644.

The *Mayor of Philadelphia* case offers but frail support for the defendants' contention that population comparisons cannot be used to establish a prima facie case. Rather it stands for the sensible but limited proposition that the indirect evidence provided by general population comparisons does not properly yield a threshold inference of racial discrimination in circumstances where the employment sample is small or where the qualifications for the positions in question are far removed from those of the average citizen.

Nor does *Davis v. Washington,* 168 U.S.App.D.C. 42, 512 F.2d 956 (1975), *cert. granted,* 423 U.S. 820, 96 S.Ct. 33, 46 L.Ed.2d 37 (1975) assist the defendants' case. In *Davis,* the plaintiffs (using the second method discussed in *Green* ) attempted to establish a prima facie case by demonstrating that the percentage of black failures on a written examination was far greater than the percentage of white failures. The defendants responded that the plaintiffs had failed to provide a prima facie case because they had not shown a disparity between the percentage of blacks in the Metropolitan Police Department and the percentage of black population in the community. The

defendants thus contended that proof of a prima facie case required demonstration of a disparate impact with respect to both pass-fail rates and population figures. The District of Columbia Court of Appeals categorically rejected that contention:

> There is no authority—and we decline to provide any—for the proposition that proof of a racially disproportionate impact must encompass both pass-fail rates and disparate population figures. We think the precedents establish that *either* demonstration is legally sufficient to shift the burden of establishing job relatedness to the employer. *Id.* at 960 (emphasis added).

Clearly the holding of *Davis* does not support the defendants' contention that exclusive reliance on population statistics as a prima facie case is "foreign to the law." Instead the defendants point to dictum stating that

> population data [has] been considered judicially for only two purposes. There are a number of cases that have held population data alone sufficient to show racially disproportionate impact, *but in the apparent absence of data on pass-fail rates.* Other courts have noted population data merely to corroborate a showing of racially disproportionate impact based on pass-fail rates. *Id.* at 960 (emphasis added) (footnotes omitted).

Assuming the *Davis* dictum accurately described the use of population statistics by courts in the past, it is hardly a warrant for the defendants' conduct in this case. Even assuming adequate pass-fail rates on the written tests employed by the defendants, it is clear that by improper recruitment, and the use of an arbitrary height requirement, the defendants were responsible for preventing substantial numbers of Mexican-Americans from taking the tests in the first place. It is inconceivable that the District of Columbia Court of Appeals in *Davis* meant to sanction such conduct. If the defendants' reading of the law were accurate, substantial numbers of minority group members, admittedly the

victims of discriminatory devices, would be denied any form of relief merely because other fortunate members of minority groups able to overcome the first three discriminating devices were not discriminated against at the final stages of the personnel process. Indeed the *Davis* court itself rejected a similar suggestion. The defendants there argued that because the police department had engaged in affirmative effects to recruit black officers, its use of a test with a racially disproportionate impact did not offend the principles of Title VII.

The *Davis* court quite properly held that such affirmative efforts had

> no bearing on a showing that an employment practice has a racially disproportionate impact. Although the Department, quite commendably, has succeeded in increasing the proportion of black officers through vigorous efforts, it is self-evident that use of selection procedures that do not have a disparate effect on blacks would have resulted in an even greater percentage of black police officers than exists today. *Id.* at 961.

Similarly here, had the defendants not employed selection and recruitment techniques that adversely affect Mexican-Americans, greater percentages of Mexican-Americans would be employed today. Sensibly read, therefore, the *Davis* dictum is not helpful to the defendants on the pretesting discriminatory devices employed by them. *See also Erie Human Relations Commission v. Tullio*, 493 F.2d 371, 372–73 n.4 (3rd Cir. 1974) (prima facie case as to pre-exam requirements based upon general population statistics coupled with opportunity to discriminate).

■ The *Davis* dictum, however, *is* relevant to, but not dispositive of, the question of whether a prima facie case has been established with respect to the use of the written tests employed by the defendants. Clearly if the defendants could have established that the pass-fail rates on the written tests attacked by the plaintiffs did not reveal a dispropor-

tionate impact on minority applicants, general population statistics would be of limited utility. That presumably is the type of situation to which the *Davis* dictum was directed. The defendants here argue, however, that if they can establish overall acceptance rates which do not reveal a disproportionate impact on minority groups, then a disproportionate impact on a particular test does not constitute the kind of adverse impact necessary for a prima facie case. As the Sixth Circuit Court of Appeals stated in *Smith v. Troyan*, 520 F.2d 492, 497–98 (1975), "Though general ability, or intelligence, tests have often been invalidated for their racially disproportionate impacts . . . the disproportionate impacts have been in the hiring, rather than in the test results in and of themselves." Nonetheless *Smith v. Troyan* is not in point, and the defendants' position is not well taken. In *Smith*, the plaintiffs demonstrated that blacks fared less well than whites on one subtest of a total testing procedure. The Sixth Circuit would not permit a prima facie case to be established on the basis of a single subtest in circumstances where the overall hiring rate did not reveal a disproportionate impact. Specifically the court stated:

> That blacks fare less well than whites on the AGCT, a "subtest" in the process of hiring East Cleveland police officers, is insufficient in itself to require defendants to justify the AGCT as being job-related. Carried to its logical extreme, such a criterion would require the elimination of individual questions marked by poorer performance by a racial group, on the ground that such a question was a "subtest" of the "subtest." *Id.* at 498.

But the written tests challenged here did not function as subtests. They were used as pass-fail hurdles. Individuals who did not pass the tests were denied employment without any opportunity to make up for their low score by the posting of high scores in other phases of the testing process. As in *Davis*, "[I]t is self-evident that use of selection proce-

dures that do not have a disparate effect on [Mexican-Americans] would have resulted in an even greater percentage of [Mexican-American] police [and fire employees] than exists today." 512 F.2d at 961. The Civil Rights Acts protect *individuals* from discriminatory treatment. The Acts simply do not permit employers to exclude individuals from employment by use of discriminatory devices. Victims of discrimination are no less victims when an employer can point to favorable acceptance rates. Even if the "subtest" doctrine where stretched to apply to the use of pass-fail tests, it should not be applied in circumstances where an employer's total hiring has produced a population disparity unfavorable to Mexican-Americans.

█ Moreover the "subtest" doctrine itself is of dubious utility. Of course, employers should not be compelled to justify each and every question on a written test. But if a procedure forms a substantial part of an employee's selection process, and if that procedure operates adversely against minority groups, employers should not be relieved of the burden of defending that procedure merely because it did not constitute the entirety of the hiring process.

As the First Circuit Court of Appeals observed in *Boston Chapter, NAACP, Inc. v. Beecher*, 504 F.2d 1017, 1020–21 (1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975), "When widespread minority underemployment is shown to exist in a given occupation, primary selection devices should not be immunized from study by placing an unrealistically high threshold burden upon those with least access to relevant data." After all, a finding of a prima facie case "is not determinative of the issue but merely shifts the burden to the defendant to justify the use of the exam. This is a burden a public employer should not be unwilling to assume." *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F.Supp. 507, 514 (D.Mass.), *aff'd*, 504 F.2d 1017

(1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975).

It is clear that the Ninth Circuit too has declared war on unrealistically high threshold burdens in employment discrimination cases. In *United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir.), 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971), the defendants also assailed reliance on demographic statistics as a "statistical 'numbers game,' incapable of proving a violation of Title VII." *Id.* at 550. The court rejected the contention as "without support" (*id.*) and observed that:

Since the passage of the Civil Rights Act of 1964, the courts have frequently relied upon statistical evidence to prove a violation. This judicial practice has most often taken the form of the use of such data as a basis for allocating the burden of proof. On the basis that a showing of an absence or a small black union membership in a demographic area containing a substantial number of black workers raises an inference that the racial imbalance is the result of discrimination, the burden of going forward and the burden of persuasion is shifted to the accused, for such a showing is enough to establish a *prima facie* case. . . .
Of course, as is the case with all statistics, their use is conditioned by the existence of proper supportive facts and the absence of variables which would undermine the reasonableness of the inference of discrimination which is drawn. It is our belief that the often-cited aphorism, "statistics often tell much and Courts listen," has particular application in Title VII cases. *Id.* at 551 (footnotes omitted).

█ In keeping with the law prevailing in this circuit and elsewhere (*Morrow v. Crisler*, 479 F.2d 960 (5th Cir. 1973), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); *Carter v. Gallagher, supra* ),[16] this court holds that population disparity alone is sufficient to establish a prima facie case. Even if it

16. *But see Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission,*

*supra; Logan v. General Fireproofing Co.*, 521 F.2d 881, 3 FEP Cases 854 (4th Cir. 1971).

were not, the evidence respecting recruitment and the evidence introduced with respect to the height requirement and the high school education requirement is more than sufficient to establish a prima facie case. Indeed even in the absence of a population disparity, the height requirement evidence alone would suffice to provide a prima facie case. (See procedures in *Green, supra*). It is clear that the recruitment practices, height requirement, and high school education requirement have operated "in fact to exclude a disproportionate number" (*Berkelman v. San Francisco Unified School District*, 501 F.2d 1264, 1267 (9th Cir. 1974)) of Mexican-Americans from employment. Moreover, as discussed *infra*, the pass-fail rates on the written tests reveal an adverse impact on Mexican-American applicants.

The defendants argue in the alternative, however, that if demographic statistics are of consequence, the statistics involved in this case properly interpreted are favorable to them. If Santa Ana is the relevant labor market, however, the statistics are clearly unfavorable to the defendants. As recited previously, 25.8% of the city's general population is Mexican-American, but only 9.2% of the police officers and 4.5% of the firefighters are Mexican-American. The defendants argue, however, that resort to the city's general population statistics is inappropriate. They believe that a comparison resting on such statistics is faulty for two reasons: it looks to the wrong geographic area, and it looks at too broad a population. Instead the defendants urge that the court look to the percentage of Mexican-Americans in the Orange County labor force as the appropriate locus for comparative purposes.

### A. Geographic Area.

At the outset, it is relevant to observe that the courts, albeit without much discussion, have consistently looked to the city, *i.e.*, the geographic area served by police and fire departments, in considering the existence of a prima facie case. *Boston Chapter, NAACP, Inc. v. Beech-*

*er, supra*, 504 F.2d at 1020 n.4 (1st Cir. 1974); *Afro American Patrolmen's League v. Duck*, 503 F.2d 294, 299 (6th Cir. 1974); *Erie Human Relations Commission v. Tullio, supra*, 493 F.2d at 372–73 (3d Cir. 1974); *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, supra*, 482 F.2d at 1335 (2d Cir. 1973); *Carter v. Gallagher, supra*, 452 F.2d at 323. *See also Davis v. Washington, supra*, 512 F.2d at 960 n.24 (leaving question open but citing *Boston Chapter, supra*, 504 F.2d at 1020 n.4).

Nor is it surprising that the courts have so ruled. It makes sense for a city to look to its own population as the principal source of its hiring. Such a policy advances numerous governmental purposes including

the promotion of ethnic balance in the community; reduction in high unemployment rates of inner-city minority groups; improvement of relations between such groups and city employees; enhancement of the quality of employee performance by greater personal knowledge of the city's conditions and by a feeling of greater personal stake in the city's progress; diminution of absenteeism and tardiness among municipal personnel; ready availability of trained manpower in emergency situations; and the general economic benefits flowing from local expenditure of employees' salaries. *Ector v. City of Torrance*, 10 Cal.3d 129, 135, 109 Cal. Rptr. 849, 852, 514 P.2d 433, 436 (1973).

Such considerations apply with considerable force to the hiring of public safety employees. As Judge Peckham points out:

[A]ll citizens profit when the city achieves a racially integrated police force of qualified individuals who are knowledgeable of the diverse problems of different ethnic groups and who are not prey to destructive hostility from minorities who feel excluded from full participation in city government life. Clearly, the general harmony of the community is enhanced by the city's

obtaining a police force representative of its population. *Officers for Justice v. Civil Service Commission,* 371 F.Supp. 1328, 6 EPD ¶ 8956, at 6064 (N.D.Cal.1973). *See also Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission, supra,* 482 F.2d at 1341 (2d Cir. 1973).

 This is not to say that cities should be required to hire city residents for city positions. Indeed the California Constitution does not permit a city to condition city employment on city residence. Cal.Const. Art. 11, § 10.5. It is to say that there are strong grounds for respecting the impressive weight of authority that has accepted the city as the relevant basis for comparison.

 Of course, if the defendants had been able to demonstrate that economic forces beyond their control dictated that Orange County would provide the bulk of applicants, a different conclusion would be appropriate. But, as noted earlier, the fact that applications largely came from outside the city is explained by the city's recruitment policies and its reputation, not by any uncontrollable economic force.[17]

The defendants profess concern that other cities in Orange County with low minority populations will be given a license to discriminate if it should become established that they may look to their own populations in establishing hiring goals. Aside from the fact that this position requires acceptance of the unsupported assumption that those cities desire to deliberately discriminate against minority applicants, there is merit to the plaintiffs' position that consistency of decision making in this area is most likely to advance the goals of Title VII. *Cf. Legal Aid Society v. Brennan,* 381 F.Supp. 125, 135 (N.D.Cal.1974).

This court, therefore, holds that the City of Santa Ana is the proper geographic area to examine in determining the existence of a prima facie case.

**B. *General Population Statistics.***

The defendants argue that reliance on general population statistics is improper because those statistics include people who could not possibly be employed by the Santa Ana Police and Fire Departments. They suggest that labor force statistics are more accurate.

Again it is instructive to observe initially that each of the police and fire cases, *supra,* has relied upon general population statistics, not labor force statistics.

 Second, whether the city's Mexican-American general population percentage is considered or the city's Mexican-American labor force percentage, the disparity between either of those percentages and the percentage of Mexican-Americans in the relevant departments is sufficiently severe as to justify a threshold inference of discrimination.[18]

Third, there is considerable room to question whether labor force statistics are more precise. Since the departments in question will not hire anyone over the age of thirty-one, it is clear that labor force statistics include individuals who could not possibly be employed by the departments in question. Moreover, labor force percentages include employed individuals who are likely to be uninterested in public safety employment and exclude individuals who are no longer actively seeking work because they know that positions are not immediately available. Thus it is unclear that "labor force" statistics give a more precise view of the available labor pool. Indeed, if any departure from general population

---

**17.** Nor is there merit to the defendants' contention that they were advised by various agencies to regard Orange County as the relevant geographic yardstick. Indeed, to the contrary, the evidence reveals that the California Fair Employment Practices Commission specifically counseled the defendants to look to the city in establishing hiring goals, warning that, "[T]he minority community might understandably question your integrity if, at the outset, you determined that their representation was not considered in the city's affirmative action plan."

**18.** See ¶ 10 of section I.

statistics were appropriate, the evidence submitted in this case suggests that the percentage of Mexican-Americans in a potential applicant pool is even greater than the percentage of Mexican-Americans in the general population. The court's exhibits suggest that the percentage of Mexican-Americans in the age groups considered by the departments for employment exceeds that of the labor force and general population percentages. This conclusion obtains even without considering the plaintiffs' suggestions that minorities would tend to be more interested in this type of employment than would whites because they tend to be unemployed more than whites, because they tend not to be qualified for positions which require advanced education, and because their inability to travel long distances makes them comparatively more likely to apply for work in the city in which they reside.

But there seems to be little purpose in departing from general population statistics at the level of the prima facie case. The defendants insist that it is the responsibility of the court at the level of the prima facie case to determine with precision the number or percentage of qualified potential applicants. The ultimate thrust of this argument would force the plaintiffs to define the job and its qualifications, and to determine the quality of the testing techniques used by the defendants to determine the qualifications of applicants.[19] But it is precisely the purpose of the case law surrounding the prima facie case (or disproportionate impact) to put that burden on the defendants. Thus, the criticism of general population statistics in the context presented here must be rejected.

IV. *Height Requirements.*

The EEOC Guidelines evince a special concern that height requirements not be improperly used to exclude protected groups from employment:

Title VII is intended to eliminate covert as well as the overt practices of discrimination, and the Commission will, therefore, examine with particular concern cases where persons within the jurisdiction of the Commission have been denied equal employment opportunity for reasons which are grounded in national origin considerations. Examples of cases of this character which have come to the attention of the Commission include . . . denial of equal opportunity to persons who as a class of persons tend to fall outside national norms for height and weight where such height and weight specifications are not necessary for the performance of the work involved. 29 C.F.R. § 1606.1(b).

In a series of decisions, the Equal Employment Opportunity Commission has invalidated height requirements that operated to exclude protected groups in the absence of a showing that the requirement was "so necessary to the safe and efficient operation of his business as to justify the policy's discriminatory effects." EEOC Decision No. 71–1529, CCH EEOC Decisions ¶ 6231, at 4411 (1971) (Mexican-Americans and females), citing Gregory v. Litton Systems, Inc., supra, and Hicks v. Crown Zellerbach Corp., 310 F.Supp. 536, 3 EPD ¶ 8037 (E.D.La.1970). EEOC Decision No. 74–25, CCH EEOC Decisions ¶ 6400 (1974) (fire department); EEOC Decision No. 71–2643, EEOC Decisions ¶ 6286 (1971) (females); EEOC Decision No. 71–1418, CCH EEOC Decisions ¶ 6223 (1971) (Mexican-Americans and females).

Several courts have followed suit. *Officers For Justice v. Civil Service Commission,* 395 F.Supp. 378, 380 (N.D.Cal. 1975) (police department height requirement discriminates against "Asians, Latins and females"); *Lum v. New York City Civil Service Commission,* 9 EPD ¶ 9947 (S.D.N.Y.1975) (sufficient showing for preliminary injunction for employment as a police officer); *Hardy v.*

---

**19.** Thus *Rios v. Enterprise Association Steamfitters,* 501 F.2d 622 (2d Cir. 1974) is not in point since it dealt with the standards to be applied at the remedial stage, not with the standards appropriate to the determination of the existence of a prima facie case.

*Stumpf,* 37 Cal.App.3d 958, 112 Cal.Rptr. 739 (1974) (height requirement discriminates against females).

The defendants, hoping for a contrary result, point to *Smith v. Troyan, supra,* and *Davis v. County of Los Angeles,* 8 FEP Cases 239 (C.D.Cal.1973). In *Davis,* the court found that a minimum height standard of 5′ 7″ was "substantially and reasonably related to job performance as a fireman." That finding of fact was reached on the basis of the testimony at trial, the Pre-Trial Order, the papers filed and other proceedings held in connection therewith. There the defendants offered evidence to support the finding of fact entered by Judge Gray. In this case, Mr. Guenther admitted that the height requirement was not a precise measure of the physical skills needed for the job and that more comprehensive job related measures were available. In the post trial briefs in this case, the defendants do not point to even a line of testimony that could support the notion that the height requirement is a "business necessity." If the defendants intended to support the height requirement, they needed to support it with testimony in this case, not by citation to a finding of fact based on evidence not before this court. *See also Hail v. White,* 8 EPD ¶ 9637 (N.D.Cal.1973).

Of greater substance is the defendants' reliance on *Smith v. Troyan, supra.* The defendants point to *Smith* with some vigor because in that case the Sixth Circuit Court of Appeals reversed a district court decision (*Smith v. City of East Cleveland,* 363 F.Supp. 1131 (N.D. Ohio 1973) which had furnished at least partial support for the other decisions on the issue. *Officers For Justice v. Civil Service Commission, supra,* 395 F.Supp. at 381; *Lum v. New York City Civil Service Commission, supra,* 9 EPD at 6986 n. 6; *Hardy v. Stumpf, supra,* 37 Cal.App.3d at 962–63, 112 Cal.Rptr. 739.

In *Troyan,* the plaintiff alleged that the use of height and weight requirements discriminated against her on the basis of sex. The trial court was unable to find any "rational support for the height and weight requirements" and concluded that "the requirements are based solely on the stereotype of the large male police officer." 363 F.Supp. at 1144. In reversing, the Sixth Circuit applied the relaxed standard of no "rational support," proceeded to reexamine and reweigh the evidence, and concluded that the district court "erred in finding no 'rational support' for the height requirement." 520 F.2d at 496. Whatever the merits of the *Troyan* court's appellate reweighing of evidence, it is readily distinguishable from this case. In *Troyan,* the Sixth Circuit was able to point in the record to the "uncontradicted" testimony of three East Cleveland police officials in support of the "need" for a height requirement. *Id.* The appellate court found it noteworthy that none of the plaintiff's experts had police experience. *Id.* In this case, the defendants' testimony does not support the height standard.

Even more important, whatever the merits of the application of the rational basis standard in *Troyan,* it has no role to play in this case. The *Troyan* court was careful to observe that "[n]oteworthily absent in plaintiff's complaint . . . were references to Title VII of the Civil Rights Act of 1964. . . . Of course, what Title VII compels may differ from what the equal protection clause, in itself, compels."

■ In this case, the plaintiffs have alleged a Title VII cause of action, thus invoking the business necessity test. Moreover, although the meaning of the equal protection clause and Title VII may differ as applied to cases involving gender based discrimination (*see, e. g., Berg v. Richmond Unified School District,* 528 F.2d 1208, 1211–1212 n.8 (9th Cir. 1975)), the courts have been hard pressed to identify any distinction between the two in cases involving racial discrimination and have routinely applied the same standard in both types of cases. *See, e. g., Davis v. Washington, supra,* 512 F.2d at 958 n.2; *Afro American Patrolmen's League v. Duck, supra,* 503 F.2d at 301; *Bridgeport Guardians, Inc.*

*v. Members of the Bridgeport Civil Service Commission, supra,* 482 F.2d at 1337.

Thus *Troyan* is distinguishable on three separate grounds: it was decided on the basis of a record quite different from this one; it did not contain a Title VII claim; it did not consider a racial challenge to the height requirement. Indeed, if anything, the *Troyan* decision supports the plaintiffs' position here. Since the record in *Troyan* did not contain evidence justifying a weight standard at issue, the Sixth Circuit affirmed the district court's determination that the weight requirement violated the equal protection clause. *Id.* at 497.

■ The defendants here too have failed to justify the height standard, and the plaintiffs have established that the use of the height requirement applied by the defendants was in violation of Title VII and the general Civil Rights Acts.[20]

### V. *High School Requirement*

In *Griggs v. Duke Power Co., supra,* the Court struck down a high school education requirement for entry into particular departments of a private company, observing that:

> The facts of this case demonstrate the inadequacy of broad and general testing devices as well as the infirmity of using diplomas or degrees as fixed measures of capability. History is filled with examples of men and women who rendered highly effective performance without the conventional badges of accomplishment in terms of certificates, diplomas, or degrees. Diplomas and tests are useful servants, but Congress has mandated the commonsense proposition that they are not to become masters of reality. *Id.,* 401 U.S. at 433, 91 S.Ct. at 854, 28 L.Ed.2d at 165.

The Court in *Griggs,* of course, did not hold that a degree requirement could not be required for any job. Instead it found "on the record" before it that the high school completion requirement did not "bear a demonstrable relationship to successful performance of the jobs for which it was used." *Id.* at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164. The courts and the EEOC have reached similar conclusions in a number of other cases. *See, e. g., Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974); *Johnson v. Goodyear Tire and Rubber Co.,* 491 F.2d 1364 (5th Cir. 1974); *United States v. Georgia Power Co., supra; Carter v. Gallagher, supra; Roman v. Reynolds Metal Co.,* 368 F.Supp. 47 (S.D.Tex.1973); EEOC Decision No. 74–53, CCH EEOC Decisions ¶ 6410 (1973); EEOC Decision No. 73–0499, CCH EEOC Decisions ¶ 6402 (1973); EEOC Decision No. 72–1395, CCH EEOC Decisions ¶ 6339 (1972).

Despite the quantity of decisions on the invalidity of educational requirements, the specific standards by which those requirements are to be judged has yet to be definitively resolved. Plaintiffs here contend that educational requirements must be validated by empirically based studies adhering to the minimum validation requirements set out in the EEOC Guidelines. 29 C.F.R. § 1607.5.

The language of the Guidelines supports this position. The Guidelines provide that "tests" must be validated by "empirical data demonstrating that the test is predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated" (29 C.F.R. § 1607.-4(c) (emphasis added)) and further provide for and delineate the minimum standards relevant to the assessment of the empirical data. 29 C.F.R. § 1607.5. Moreover it is clear that the Guidelines define "tests" to include educational requirements:

> For the purpose of the guidelines in this part, . . . . [t]he term "test" includes all formal, scored, quantified

---

20. The defendants' adverse effect argument rests on an erroneous factual premise. See ¶ 12 of section I. The standing argument is treated in section II. The mootness argument is dispensed with in section IX.

or standardized techniques of assessing job suitability including . . . specific qualifying or disqualifying personal history or background requirements, specific *educational* or work history *requirements* . . . . 29 C.F.R. § 1607.2 (emphasis added).

■ The Guidelines, of course, are the " 'administrative interpretation of the Act by the enforcing agency,' and consequently they are 'entitled to great deference.' " *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280, 304 (1975), *quoting Griggs v. Duke Power Co., supra*, 401 U.S. at 433–34, 91 S.Ct. at 854, 28 L.Ed.2d at 165. Yet two courts have upheld high school education requirements as applied to police departments despite the absence of validation studies meeting the Guidelines.[21] *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972); *Arnold v. Ballard*, 390 F.Supp. 723 (N.D. Ohio 1975).

The treatment of the high school requirement in *Griggs* suggests that the approaches taken in *Castro* and *Ballard* are correct.[22] In *Griggs*, the Court did not indicate that the Guidelines were applicable to the general education requirement. If it had thought the Guidelines were applicable, extended discussion of the issue of job-relatedness would have been unnecessary since no validation study had even been attempted. Moreover, while discussing general intelligence tests, the Court dropped a telling footnote revealing that the Court's conception of the term "tests" does not coincide with that of the EEOC: "Section 703(h) applies only to tests. It has no applicability to the high school diploma

requirement." 401 U.S. at 433 n.8, 91 S.Ct. at 854, 28 L.Ed.2d at 165.

This court, therefore, is reluctant to accept the idea that education requirements must be empirically validated. To accept that concept would be to adopt the proposition that the empiricist's methods of arriving at truth are the only acceptable ones. It would involve the categorical rejection of reports of Presidential Commissions on the basis that they were "unscientific." Before this court will accept the notion that empirical methods of finding truth are the *sine qua non* of Title VII determinations (let alone Constitutional determinations), a clearer signal from the appellate courts will be required. It is one thing to say that paper and pencil tests must be validated by prevailing concepts of educational measurement (*Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 431, 95 S.Ct. at 2378, 45 L.Ed.2d at 304); it is quite another to say that the common sense judgment and reasoning of expert observers cannot be considered as relevant to the assessment of the value of institutional education to the increasingly complicated tasks of the police officer in an urban environment.

■ The courts in *Castro*[23] and *Ballard*, on evidence similar to that presented in this case, concluded that a high school education requirement was a reasonable prerequisite for employment as a police officer. There is no basis for a different determination here.

■ The same conclusion does not obtain for the firefighter position, however. The strongest evidence for the defendants' position is the fact that the

---

**21.** The *Ballard* decision refers to a validation study involving a different police department, but does not indicate whether the study was conducted in compliance with the Guidelines. Moveover, it relied upon reports such as those mentioned in ¶ 13 of section I which, of course, do not purport to meet the Guidelines.

**22.** *Castro* and *Ballard* could be distinguished on the ground that no Title VII claim was alleged. Yet, as discussed previously, the courts have tended to equate the standards for determining the presence of racial discrimina-

tion in Title VII and general civil rights acts cases. Appellate courts may determine that this is an area in which the standards differ.

**23.** *Castro's* method for evaluating paper and pencil tests was disapproved in *Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 413 n.7, 431, 95 S.Ct. at 2378, 45 L.Ed.2d at 304, but the *Albemarle* ruling did not bear upon the standards relevant to the assessment of education requirements.

reading level required for the comprehension of firefighter training manuals is at the 11th to 12th grade levels. Even assuming that the training manuals need to be written at that level, the evidence merely points to the conclusion that high school reading ability is necessary for successful employment as a firefighter. As the Fifth Circuit Court of Appeals explained in *United States v. Georgia Power Co., supra*, 474 F.2d at 918:

> "At best, the only justification for this requirement is the obvious eventual need for above-average ability to read and comprehend the increasingly technical maintenance manuals, the training bulletins, operating instructions, forms and the like demanded by the sophisticated industry . . . .
> In such a context, the high school education requirement cannot be said to be reasonably related to job performance. This is not to say that such requirements are not desirable . . . it simply means that the 'diploma test' cannot be used to measure the qualities. Many high school courses needed for a diploma (history, literature . . . etc.) are not necessary for these abilities. A new reading and comprehension test . . . might legitimately be used for this job . . . ."
> *Quoting* the district court below.

A general educational background can fairly be regarded as a minimum prerequisite for the performance of the duties of a police officer, but the defendants have failed to make the same case for the firefighter position. *Cf. Carter v. Gallagher, supra.*

### VI. *Form 45 Test.*

In 1973, seven of ten Mexican-American firefighter applicants were disqualified for employment because they failed the Form 45 test. In the same year fifty of eighty-six white applicants passed the examination. Thus 30% of Mexican-American applicants passed the test; 58.1% of white applicants passed the examination.

■ The defendants argue that adverse impact cannot be drawn from such a small sample of Mexican-American applicants. The sample is concededly small, but the plaintiffs have presented sufficient corroborative evidence to establish that the small size of the sample should not insulate the test from further scrutiny. *Cf. Boston Chapter, NAACP, Inc. v. Beecher, supra*, 504 F.2d at 1020–21. First, the plaintiffs' expert, Dr. Kirkpatrick, testified that the studies have generally concluded that white individuals perform better than members of minority groups on written tests, and that their superior performance is attributable to the culturally biased character of the testing situation. Dr. Kirkpatrick's testimony is consistent with judicial findings in Title VII cases that have noted the

> "substantial body of evidence that black persons and other disadvantaged groups perform on the average far below the norm for whites on generalized intelligence or aptitude tests."
> . . . This phenomenon is the result of the long history of educational deprivation . . . . *Davis v. Washington, supra*, 512 F.2d at 961.

Moreover, "any written test in English would seem obviously harder for persons whose native tongue is Spanish." *Boston Chapter, NAACP, Inc. v. Beecher, supra*, 504 F.2d at 1021 n.7. It is ironic indeed that the Santa Ana Fire Department, which the evidence revealed has experienced difficulties in emergency situations because of the inability of members of its department to communicate effectively with Spanish speaking members of the community, should use a test which by its very nature operates to exclude those applicants it may need the most.

■ Given this evidence, the adverse impact of the test cannot be written off to the vagaries of sampling. The adverse impact is the product of its discriminatory effect. In fact, the administration of the test in 1974 further supports that conclusion. If the defendants had employed the same method of scoring the test in 1974 used in 1973, 21.2% of the Mexican-American applicants

would have passed and 56% of white applicants would have passed, a difference of greater than two to one favoring the whites. The facts stipulated by the defendants indicate that more than 90 Mexican-Americans and 370 whites took the test in 1974. There was conflicting evidence on the extent to which the applicant populations of 1974 were comparable to those of 1973. For example, the nature of the position changed in 1974, and there was evidence that some of the applicants had taken the test before (one hardy soul, according to hearsay testimony, had taken it ten times). However much that fragmentary evidence might cause one to question reliance on the scores of particular individuals, there was insufficient evidence proffered by the defendants to cast doubt on the propriety of aggregate comparisons between the 1973 and 1974 test administrations. Although the factors pressed by the defendants may have served to exaggerate the adverse impact, the evidence is persuasive that there was an adverse impact to be exaggerated. It is clear that the test "in question select[s] applicants for hire . . . in a racial pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 425, 95 S.Ct. at 2375, 45 L.Ed.2d at 301.

Thus the issue becomes whether or not the defendants have demonstrated that the test is a "business necessity." *Griggs v. Duke Power Co., supra,* 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 163. A demonstration of job relatedness is a necessary condition (albeit not necessarily a sufficient condition, *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 425, 95 S.Ct. at 2375, 45 L.Ed.2d at 300) to meet the business necessity test.

As discussed previously, the plaintiffs contend that the defendants' purported validation of the test is seriously flawed both in terms of the adequacy of the sample and the adequacy of the procedures to protect against supervisorial bias in the administration of ratings.

### A. *Adequacy of the Sample.*

The Form 45 test was administered to individuals with experience ranging from one to six years in firefighting. The defendants maintain that since a correlation was found between their individual test scores and their job performance, the test has been properly validated.

The plaintiffs respond, however, that the fact that a correlation exists between *experienced* individuals' performance on the test and their job performance does not permit a leap to the conclusion that *inexperienced* individuals' performance on the test (*i. e.,* applicants without firefighter experience) will correlate with their ability to perform the job. The essence of the plaintiffs' contention, then, is that for purposes of this test the sample of experienced workers is so radically different from inexperienced applicants that conclusions based on one sample's experiences cannot be properly attributed to the other.

The evidence amply supports this position. Thirty of the seventy-five items on the test involve basic mechanical and trade knowledge. An additional fifteen require recognition of tools and their functions. Dr. Kirkpatrick testified after examining the study and the test description therein, that those people with a year's experience on the job would as a matter of course be in a better position to answer those forty-five items than inexperienced applicants. He testified that the forty-five questions were knowledge items, and that the correlation produced by the study may simply reveal that those people on the job who acquired more knowledge in their training and experience were likely to be better firefighters.

Moreover, Dr. Kirkpatrick testified that the participants in the test had already demonstrated ability in test taking in acquiring their employment (having taken different written tests) and expressed the position that it would be erroneous to draw any conclusions about the ability of poor test takers to perform the job, since they were no part of the sample.

Dr. Kirkpatrick's conclusions are buttressed by the fact that 95% of the participants in the study scored higher than the mean score of the applicants who took the test in Santa Ana. The study supports the conclusion that experienced firefighters with greater mechanical knowledge perform better than those firefighters with lesser knowledge, but that conclusion says nothing about the extent to which the Form 45 test can assist in determining which applicants can better learn what needs to be learned in a training program. This court, therefore, cannot assume that because there is a relationship between test performance and current job performance for persons *with* job experience that a similar relationship obtains for applicants *without* job experience.

The United States Supreme Court expressed a similar criticism of a validation study in *Albemarle Paper Co. v. Moody, supra,* at 435, 95 S.Ct. at 2380, 45 L.Ed.2d at 306:

Albemarle's validation study dealt only with *job-experienced,* white workers; but the tests themselves are given to new job *applicants,* who are younger, *largely inexperienced,* and in many instances nonwhite. The Standards of the American Psychological Association state that it is "essential" that

"[t]he validity of a test should be determined on subjects who are at the age or in the same educational or *vocational situation* as the persons for whom the test is recommended in practice." (emphasis added), *citing Standards, supra,* at ¶ C 5.4 (1966). *See also Boston Chapter, NAACP, Inc. v. Beecher, supra,* 504 F.2d at 1025–26.

Indeed the 1974 edition of the A.P.A. Standards observes that, "Validity information for tests intended for guidance should generally be determined on subjects tested prior to or near the time when they are making educational or vocational choices. *Standards, supra,* at ¶ E 6.1.1.

Defendants contend, however, that the study specifically controlled for the impact of experience and determined that job experience was not a factor influencing the outcome. Specifically, the statistics generated by the study indicate that there was no relationship for any of the racial groups between time on the job and performance on the test.

The difficulty with the study's "control" for experience is that it did not (because the sample would not permit it) control for the effect of one year's experience on the job. The test items involved *basic* mechanical and tool knowledge. It would be surprising if anything significant were learned beyond the first year of experience on the job. Since each and every participant in the study had at least one year's experience as a firefighter, the study could not account for the crucial variable: experience as a firefighter versus no experience as a firefighter.

The failure to control for this crucial variable in and of itself undermines the validation claim. This conclusion is not, the defendants' urgings to the contrary, at odds with the EEOC Guidelines.

EEOC Guideline 29 C.F.R. § 1607.5(b)(1) provides in part that "[w]here a validity study is conducted in which tests are administered to present employees, the sample must be representative of the minority groups currently included in the applicant population." The defendants infer from this language that studies using incumbent employees (*i. e.,* concurrent validation studies) are sanctioned by the Guidelines. Since the Guidelines constitute " '[T]he administrative interpretation of the Act by the enforcing agency,' and consequently . . . are 'entitled to great deference' " (*Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 431, 95 S.Ct. at 2378, 45 L.Ed.2d at 304, *quoting Griggs v. Duke Power Co., supra,* 401 U.S. at 433–34, 91 S.Ct. at 854–855, 28 L.Ed.2d at 165), the defendants reason that concurrent validation studies are approved by Title VII. The defendants' reasoning is correct, but

the syllogism leads only so far. It does not reach to the conclusion that a study based upon questions placing a premium on experience must be considered to be validated merely because it is concurrent. It does not require the conclusion that a sample of experienced employees is always representative of a sample of applicants. In short, to hold that this concurrent study failed to validate a particular test does not amount to a denunciation of 29 C.F.R. § 1607.5(b)(1). *Cf. Albemarle Paper Co. v. Moody, supra.*

### B. *Supervisorial Bias.*

In addition to their attack on the adequacy of the sample, plaintiffs attack the validation study for its failure to comply with EEOC Guideline 29 C.F.R. § 1607.5(b)(4) which states that, "In view of the possibility of bias inherent in subjective evaluations, . . . the ratings should be closely examined for evidence of bias." As the Fourth Circuit Court of Appeals explained, when test scores are conducted with biased supervisors' ratings, " 'the validation, if it can be called that, is of questionable value and may simply prove that the test has the same bias as the supervisors.' " *Albemarle Paper Co. v. Moody,* 474 F.2d 134, 139 (4th Cir. 1973), *vacated on different grounds,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

The administrators of the study used a number of techniques to prevent bias from distorting the supervisory ratings. Supervisors were trained to disregard general impressions and to concentrate instead on nine "cognitive" factors believed to represent critical job dimensions. No one supervisor established a rating. Instead supervisors met together to discuss each rating and to resolve differences in judgment. Moreover, precautions were taken to insure that supervisors did not know the test scores.

In order to determine the success of these preventative techniques, the raters were asked to rate the individuals on three additional (although not identified as such) standards designed to reveal the existence of bias. These "noncognitive"

criteria were compatibility, reasonableness, and team work. As the study itself observed, "A serious problem with subjective criteria such as performance ratings scales is that extraneous factors can affect the rater's judgment. Employees who are well-liked are apt to be treated kindly by raters, while those who are disliked tend to be treated more harshly. In the validation study, this kind of rater bias can pose a serious problem." Exh. 8 at 25–26.

Dr. Waibel, the Senior Consultant on the Project Staff for the validation study, testified (and the study itself confirmed) that the original plan had been to drop from the study anyone with "a very extreme rating on one of these noncognitive factors . . . ."

After the results were compiled, the plan changed. The reason for this departure was that if the study eliminated those individuals who had been the subject of extreme ratings on noncognitive factors, the sample of Mexican-Americans (which was small to begin with— only 34) would have been reduced to a patently inadequate level.

In short, the study examined the ratings for bias, found strong evidence of bias, and then proceeded to use the biased results. Clearly such procedures are not countenanced by the EEOC Guidelines or by Title VII. Defendants rightly point out that there is no authority for the proposition that noncognitive controls must be employed in a validation study. They properly observe that such a control, although desirable, has never been held to be necessary. Nonetheless when a study has proceeded to include the criteria in performance evaluations, the defendants will not be heard to say they did not like what was found. Having demonstrated that the techniques designed to root out bias had been unsuccessful, they cannot rely on demonstrably biased data.

The proper course would have been to exclude the biased data from consideration. EEOC Guideline 29 C.F.R. § 1607.5 (b)(5) states that

Data must be generated and results separately reported for minority and nonminority groups wherever technically feasible. Where a minority group is sufficiently large to constitute an identifiable factor in the local labor market, but validation data have not been developed and presented separately for that group, evidence of satisfactory validity based on other groups will be regarded as only provisional compliance with these guidelines pending separate validation of the test for the minority group in question.

Therefore even if the sample of job experienced employees were deemed to be representative of the applicant population in this case, the validation could only be considered provisional under the EEOC Guidelines. Absent the biased data, the sample of Mexican-Americans is, as the defendants admit, too small to permit any conclusions to be drawn.

The wisdom of this procedure applies with particular force in a circumstance in which the mean score of Mexican-American firefighters on the test was lower than the white firefighters but in which Mexican-American mean ratings in terms of job performance was the equivalent of the white firefighters. Although the statistical techniques employed by the defendants adequately answer plaintiffs' objections based on mean score differences (see note 2), it is appropriate to view claims of differential validity with caution in circumstances where the data do not speak with unmistakable clarity.

This court is constrained to hold that the experienced firefighters constituted an inadequate sample in the circumstances of this case, and the quality of the procedures to guard against supervisorial bias in the administration of the ratings was inadequate. The defendants, therefore, have failed to meet their burden in validating the Form 45 test.

Moreover, this court holds that even if a sufficient showing had not been made to shift the burden of persuasion to the defendants, Dr. Kirkpatrick's testimony concerning the cultural bias inherent in the administration of examinations such as the Form 45 test is sufficient to demonstrate the invalidity of the Form 45 test as applied to Mexican-Americans, given the lack of persuasive evidence to the contrary. Thus, even if the defendants' reading of the law on adverse impact were correct, and the plaintiffs retained the burden to demonstrate the test's invalidity, the result reached herein would not be altered. Based on the testimony and exhibits presented in this case, the court concludes that the Form 45 test operates to discriminate unreasonably against Mexican-American firefighter applicants.

## VII. *Short Form Test.*

The plaintiffs contend that the administration of the Short Form test to police department applicants prior to 1974 and the firefighter applicants prior to 1973 operated to discriminate against Mexican-Americans. Here the defendants do not contend that the Short Form test has been validated. Indeed the parties stipulated that "No studies have been conducted, of which the parties hereto are aware, showing whether or not the Short Form Test . . . is a job-related, valid predictor of job performance for the positions of police officer and firefighter."

Moreover it is clear that Mexican-Americans performed poorly in comparison with whites. In 1972–73, 58.6% of white police officer applicants passed the test but only 31.8% of Mexican-American applicants passed the test. In 1972, 53.7% of white firefighter applicants passed the examination, but only 35.3% of Mexican-American applicants passed the examination. Dr. Kirkpatrick found the sample involved to be of sufficient size to permit the conclusion that the difference in pass rates was "statistically significant." The conclusion is not surprising, for, as he also testified, tests such as the Short Form test "normally have an adverse effect on minority racial groups."

Defendants argue that since the overall comparative acceptance rates do not

reveal discrimination, the fact that the test operated to unfairly exclude Mexican-Americans should be ignored. As previously discussed, there is no merit to this argument. See section III.

Defendant City of Santa Ana contends that it cannot be held liable for the Short Form test administrations in 1972 because the record does not disclose whether or not the tests were administered prior to March 24, 1972, the date when Title VII was amended to apply to municipalities. 42 U.S.C. § 2000e(a).[24]

The city's argument is premised on the assumption that municipalities are immune from liability under 42 U.S.C. §§ 1981, 1983 and that the only basis for liability lies in Title VII. This assumption is only partly correct.

The conclusion that a municipality is not a proper defendant under 42 U.S.C. § 1983 has been definitely established by the United States Supreme Court. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (damages); *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973) (injunctions).

*Monroe*, however, was later extended by the Ninth Circuit to preclude § 1981 municipal liability in a per curiam two paragraph opinion which did not identify the conceptual basis for the extension. *Arunga v. Weldon*, 469 F.2d 675 (9th Cir. 1972). The summary nature of the *Arunga* opinion suggests that the court did not focus upon the possible differences between the two sections. Since *Arunga*, it has become increasingly clear that a ready equation between §§ 1981 and 1983 is inappropriate.

42 U.S.C. § 1983 provides that, "Every *person* who, under color of any statute, . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." (emphasis added).

The Supreme Court held in *Monroe* and *City of Kenosha* that a city is not a "person" within the meaning of § 1983. Significantly there is no comparable term identifying the class of *defendants* in § 1981:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The scope of the two prohibitions is radically different. Section 1983 is a dragnet clause embracing constitutional violations of every type and description provided that state action is involved. Section 1981 is confined to violations involving racial discrimination independent of the existence of state action. Section 1981 is founded upon the Thirteenth Amendment; section 1983 is founded upon the Fourteenth Amendment. Section 1981 is a part of the Civil Rights Act of 1866; section 1983 is a part of the Ku Klux Klan Act of 1871. When two statutes differ in language, vary in scope, proceed from different sources, and involve independent legislative histories, there are grounds to pause before imputing case law conclusions about one to the other.

In *District of Columbia v. Carter*, 409 U.S. 418, 422, 93 S.Ct. 602, 605, 34 L.Ed.2d 613, 619 (1973), two months after the decision in *Arunga*, the Supreme Court made clear that 42 U.S.C. § 1982, the sister statute of § 1981, which prohibits racial discrimination in the sale of property, constitutes "an 'absolute' bar to *all* such discrimination, private as well as public, federal as well as state." Moreover the Ninth Circuit itself has

---

**24.** Since the question of the city's liability is important on the backpay issue, it would be appropriate to reopen the evidence on the question of the dates of the 1972 test administrations during the course of proceedings on that question.

since come to recognize that "Both sections (1981 and 1982) on their face prohibit *all* racial discrimination *regardless of source* . . . ." *Bowers v. Campbell*, 505 F.2d 1155, 1158 (9th Cir. 1974) (emphasis added).

In addition, there is strong evidence that Congress understands the scope of § 1981 to include the activities of municipalities. As previously mentioned, the Congress amended Title VII in 1972 to prohibit discrimination by state and local governments. The House Report accompanying the House bill (which was passed in lieu of the Senate bill) stated the view that:

> [T]he remedies available to the individual under Title VII are co-extensive with the [individual's] right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and . . . the two procedures augment each other and are not mutually exclusive. The bill, therefore, by extending jurisdiction to State and local government employees does not affect existing rights that such individuals *have already been granted* by existing legislation." 1972 *U. S. Code Congressional and Administrative News* 2154 (emphasis added).

Thus there is little basis for finding that governments are immune from the prohibitions of either § 1981 or § 1982.[25] Indeed as Chief Judge Lord put it, "[I]f purely private citizens are subject to liability under §§ 1981 and 1982, it would seem anomalous to exempt government, the upholder of law, from similar responsibility for racial discrimination." *Maybanks v. Ingraham*, 378 F.Supp. 913, 917 (E.D.Pa.1974).[26]

Particularly in view of Judge Marshall's illuminating discussion of the respective legislative histories of §§ 1981 and 1983 in *Robinson v. Conlisk*, this court concludes with him that:

> In plain and unambiguous terms, § 1981 grants to all persons the same right to make and enforce contracts and to the full and equal benefit of all law. Section 1981 prohibits all discrimination, whether it be by individuals, municipalities or police review boards. I cannot ignore the legislative history and broad language of § 1981. Section 1981 means what it says: all discrimination is prohibited, regardless of whether the source of the discrimination is a municipal corporation. 385 F.Supp. 535, 7 EPD ¶ 9369 at 7653 (N.D.Ill.1974).[27]

**25.** *Moor v. Madigan*, 458 F.2d 1217 (9th Cir. 1972), *rev'd in part sub nom., Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) is not contrary to this position. This court's examination of the briefs indicates that the point was not raised on appeal at the circuit level, nor was it raised or denied at the Supreme Court level. 411 U.S. at 696 n.4, 93 S.Ct. at 1788, 36 L.Ed.2d at 602. At the circuit level, the appellants did not argue that the scope of §§ 1981 and 1983 might vary but instead argued that political entities could be sued on a theory of vicarious liability. In effect, they conceded the issue discussed here.

**26.** District courts are divided on the question. *Compare, e. g., Maybanks v. Ingraham*, supra; *Hines v. D'Artois*, 383 F.Supp. 184 (W.D.La. 1974); *Robinson v. Conlisk*, 385 F.Supp. 529, 7 EPD ¶ 9369 (N.D.Ill.1974) *with e. g., Black Brothers Combined v. City of Richmond*, 386 F.Supp. 147 (E.D.Va.1974); *Cohen v. City of Miami*, 54 F.R.D. 274 (S.D.Fla.1972); *Bennett v. Gravelle*, 323 F.Supp. 203 (D.Md.1971). The Ninth Circuit in *Milton v. Nelson*, No. 74–

2559, Slip Opinion at 2 (Sept. 2, 1975) held that §§ 1981 and 1983 would not permit an action against political entities; however, the opinion has since been modified. In the modified opinion, the court upheld the dismissal of the § 1981 claim because no racial discrimination was present, and adhered to its earlier position with respect to § 1983. 527 F.2d 1158 (1975). Although the opinion does not speak to the question, the fact of modification reflects the sensitivity of the Ninth Circuit to this issue.

**27.** The plaintiffs do not attempt to rely upon federal question jurisdiction. The Supreme Court in *City of Kenosha v. Bruno* appears to state that jurisdiction against municipalities based on constitutional violations will lie under 28 U.S.C. § 1331 if the jurisdictional amount requirement is met. 412 U.S. at 514, 93 S.Ct. at 2227, 37 L.Ed.2d 116. The Second Circuit and the District of Columbia Circuit have so ruled. *Brault v. Town of Milton*, 527 F.2d 73, 43 U.S.L.W. 2388 (2d Cir. 1975); *Cardinale v. Washington Technical Institute*, 163 U.S.App.D.C. 123, 500 F.2d 791, 796 n.5

## VIII. *Backpay.*

In *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 421, 95 S.Ct. at 2373, 45 L.Ed.2d at 299, the Court held that "[B]ackpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." The defendants contend that an award of backpay might restrict the City's funds to the point that the growth of affirmative action programs would be retarded. This speculative contention is not supported by concrete evidence. Although there is some discretion left for courts to deny backpay awards despite a showing of discrimination (*Dunlop v. Saghatelian,* 520 F.2d 788 (9th Cir. 1975)), this is not a case in which an exercise of such discretion is appropriate. Those plaintiffs who have been damaged by the defendants' practices deserve to be made whole. An award of backpay is necessary to further the objectives of the Act. Pursuant to the Pre-Trial Conference Order, the amount of backpay to which individuals might be entitled will be litigated in subsequent proceedings under the retention of jurisdiction in this case.

## IX. *Hiring Order.*

Predictably the parties are not in accord on the question of whether or not a hiring order is appropriate in this case. The defendants primarily argue that because their efforts have been in good faith and because they have abandoned reliance on several practices at issue in this lawsuit, a hiring order is unnecessary. The plaintiffs urge that the court order 50% of the future positions to be allocated to Mexican-Americans until population parity is reached. The court is unprepared to accept either of these positions.

The defendants' position is contradicted by the Supreme Court's opinion in

(1974). *See also Dahl v. City of Palo Alto,* 372 F.Supp. 647 (N.D.Cal.1974); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Pro-*

*Albemarle Paper Co. v. Moody, supra.* There the Court reaffirmed that "Title VII is not concerned with the employer's 'good intent or absence of discriminatory intent' for 'Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation.' " *Id.* at 422, 95 S.Ct. at 2374, 45 L.Ed.2d at 299, *quoting Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 165 (emphasis in original). The only qualification placed upon this principle is that the absence of bad faith "opens the door to equity; it does not depress the scales in the employer's favor." *Id.* Although the *Albemarle* case was decided in the context of a claim for backpay, it is clear that the *Albemarle* principles are applicable in the context of injunctive relief. The Court was explicit on this point: "To condition the awarding of backpay on a showing of 'bad faith' would be to open an enormous chasm between injunctive and backpay relief under Title VII. *There is nothing on the face of the statute or in its legislative history that justifies the creation of drastic and categorical distinctions between these two remedies.*" *Id.* at 423, 95 S.Ct. at 2374, 45 L.Ed.2d at 299 (emphasis added). It follows that "given a finding of unlawful discrimination," injunctive relief "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.* at 421, 95 S.Ct. at 2373, 45 L.Ed.2d at 298.

These principles, of course, dispose of the defendants' suggestion that because they have dropped procedures such as the height requirement, the controversy concerning it has become moot. The plaintiffs are entitled to be made whole and the court has the power and the duty to issue orders which will rectify the effects of past discrimination.

*cedure* § 3573 at 489 (1975). The Ninth Circuit has left the question open. *Aldinger v. Howard,* 513 F.2d 1257, 1259 n.1 (1975).

Even if the defendants adopted discriminatory-free policies *eo instanto,* the effects of past discrimination would linger. The controversy is not moot.

■ Thus the courts, despite objections of "reverse discrimination," have been fully prepared to issue hiring orders designed to rectify the effects of past discrimination. *See e. g., Rios v. Enterprise Association Steamfitters Local 638,* 501 F.2d 622 (2d Cir. 1974); *Morrow v. Crisler, supra; United States v. Local Union No. 212, International Brotherhood of Electrical Workers,* 472 F.2d 634 (6th Cir. 1973); *Castro v. Beecher, supra; Carter v. Gallagher, supra.*[28]

In particular, the Ninth Circuit has sanctioned an order which required a union "to select and indenture sufficient black applicants to overcome past discrimination, and to also meet judicially imposed ceiling requirements in apprenticeship program participation." *United States v. Ironworkers Local 86, supra,* 443 F.2d at 553. In response to the argument that such an order constituted an unlawful "racial quota" or "racial preference" the court responded, "There can be little doubt that where a violation of Title VII is found, the court is vested with broad remedial power to remove the vestiges of past discrimination and eliminate present and assure the non-existence of future barriers to the full enjoyment of equal job opportunities by qualified black workers." *Id.*[29]

Although some courts have been reluctant to use the word "quotas," the principle that runs through the cases is that "quotas merely to attain racial balance are forbidden, quotas to correct past discriminatory practices are not." *United States v. Wood, Wire and Metal Lathes International Union, Local Union No. 46,* 471 F.2d 408, 413 (2d Cir. 1973). *See also Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, 10 EPD ¶ 10,357 (2d Cir. 1975).

■ The defendants attempt to distinguish some of the cases (*Morrow* and *Crisler*) by contending that the degree of discrimination there was greater. But, whenever the discrimination in question is not *de minimus,* the degree of discrimination is not relevant. The plaintiffs are entitled to an order eliminating the effects of past discrimination whether or not some employers in other sections of the country have engaged in discrimination with more severe effects.

On the other hand, the court has no basis upon which to accept the 50% figure requested by the plaintiffs. In order to determine the nature of the quota and the extent of its duration, the court must have some basis upon which to determine the number of individuals who would have been hired but for the defendants' discriminatory practices in the

---

28. These decisions dispose of the defendants' arguments based on 42 U.S.C. § 2000e–2(j) and the equal protection clause. They do not discuss 42 U.S.C. § 2000e–2(h), but that section, despite defendants' contention, does not prohibit a hiring order. That section provides that "[I]t shall not be an unlawful employment practice for an employer to apply different . . . privileges of employment pursuant to a *bona fide* . . . merit system." (emphasis added). Suffice it to say that a system which relies on discriminatory devices not based on a business necessity is not a "bona fide" "merit" system. The defendants cite no authority or legislative history to the contrary. The Act does not give rights with one hand and take them away with the other. Clearly the defendants' reliance on cases involving seniority rights have nothing to do with the issue.

29. Nothing in *Western Addition Community Organization v. Alioto,* 514 F.2d 542 (9th Cir. 1975), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975) contradicts this principle. That case simply holds that since a district court decree had already been effectuated, the question of whether the defendants should be required to obey it had become moot. To the extent that it questions the propriety of quota orders not designed to alleviate the impact of past discrimination in circumstances where the employer is using properly validated procedures, it is consistent with prior law.

The *Alioto* decision does leave the equal protection argument open. The substance of that argument, however, was rejected by the Ninth Circuit in the *Ironworkers* case even though that opinion was not couched in equal protection language. The equal protection argument has been specifically rejected by other circuits in the cases cited *supra.*

years in question. One might begin with the supposition that Mexican-Americans would have been hired in numbers commensurate with their representation in the applicant population which would have been present but for the defendants' practices.[30] The size of that population is unknown. To be sure, absolute precision in this area is unlikely, but further proceedings should yield some evidence upon which to base a judgment.

The plaintiffs suggest that a quota should be imposed which would compel the defendants to reach population parity; but this court cannot assume that population parity would have been achieved but for the defendants' discriminatory conduct during the years in question in this litigation. There is no question, of course, that the defendants will have to hire Mexican-Americans in far greater numbers than they have heretofore. Once it is recognized that the city should be the defendants' primary employment market, it is clear that the practices of the city must be radically altered. A hiring order will serve to minimize the recruitment and reputation problems of the city for Mexican-Americans will know that the defendants must employ qualified Mexican-Americans. A hiring order will compensate for past discrimination. "The discrimination had the effect of injuring the minority work force as a whole, and the injury can be undone by providing relief to any member or members of that work force." Slate, "Preferential Relief in Employment Discrimination Cases," 5 Loy.L. Rev. (Chi.) 315 (1974).

There is thus a basis for an order which would require the city to hire Mexican-Americans at rates above their percentages in the relevant labor force[31]

until the past effects of discrimination have been dissipated.[32] There is no basis for an order requiring the defendants to achieve population parity. Such an order would clearly contradict 42 U.S.C. § 2000e–2(j) in the absence of a showing that but for the employer's past practices, population parity would have been achieved.

A hiring order which compels these defendants to compensate for past discrimination will permit them to continue to develop non-discriminatory innovative policies in the interim. In the event that those policies prove to be discriminatory, the court, of course, will retain jurisdiction to provide relief.

The court, therefore, holds that a preferential hiring order is required, the nature and duration of the order to be determined by the evidence produced at future proceedings or by court-approved stipulation of the parties.

Pursuant to the provisions of Rule 52(a) of the Federal Rules of Civil Procedure this opinion shall constitute the findings of fact and conclusions of law of the court.

Pursuant to 28 U.S.C. § 1291 and Rules 58 and 79(a) of the Federal Rules of Civil Procedure a judgment shall be entered as follows:

It is adjudged and decreed that:

(1) The use of height requirements constituted discrimination in violation of 42 U.S.C. §§ 1981, 1983, and § 2000e–2 except that the City of Santa Ana is not liable under § 1983 or for any use of the height requirement prior to March 24, 1972 under Title VII.

(2) The use of the high school education requirement for positions with the Santa Ana Fire Department constituted

---

**30.** That supposition might be quickly dispelled in this case since Mexican-Americans were hired in numbers commensurate with their percentages in the applicant population despite the use of discriminatory devices. On the other hand, the poor reputation of the defendants in the Mexican-American community might indicate that the Mexican-American applicants who were attracted were atypical in that they were unusually motivated.

**31.** It is at the remedial stage that the *precise* nature of the labor force becomes critical, not at the prima facie case stage. See note 19.

**32.** The order, of course, will not require defendants to hire any unqualified individuals. The defendants are always free to seek protection if insufficient qualified individuals apply.

**912**

discrimination in violation of 42 U.S.C. §§ 1981, 1983, and § 2000e–2 except that the City of Santa Ana is not liable under § 1983 or for any use of the high school education requirement prior to March 24, 1972 under Title VII. The continued use of the high school education requirement by either the police or fire departments, however, will not be illegal under any of the acts in question. The prior use of the high school education requirement for positions with the Santa Ana Police Department did not violate any of the acts in question.

(3) The use of the Form 45 test by the Santa Ana Fire Department was discriminatory and, therefore, in violation of 42 U.S.C. §§ 1981, 1983, and § 2000e–2 except that the City of Santa Ana is not liable under § 1983.

(4) The use of the Short Form test has constituted discrimination in violation of 42 U.S.C. §§ 1981, 1983, and § 2000e–2 except that the City of Santa Ana is not liable under § 1983 or for any use of the Short Form test prior to March 24, 1972 under Title VII.

(5) The recruitment policies employed by the defendants were violative of 42 U.S.C. §§ 1981, 1983, and § 2000e–2 except that the City of Santa Ana is not liable under § 1983 or for any acts prior to March 24, 1972 under Title VII.

(6) In no event does liability extend beyond the three years prior to the commencement of this action on March 22, 1974.

(7) Plaintiffs are entitled to a preferential hiring order.

(8) Plaintiffs are entitled to backpay.

(9) This court reserves jurisdiction over the parties and the action for all purposes, including but not limited to amending, changing, modifying or enforcing this judgment and all amendments, changes or modifications thereto.

(10) Plaintiffs shall recover their costs which are taxed in the sum of $____.

It is further ordered that the clerk forthwith serve copies of this opinion by United States mail upon the attorneys for the parties appearing in this action.